NOT YET SCHEDULED FOR ORAL ARGUMENT
No. 23-5026

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

A.P. BELL FISH COMPANY, INC., et al.,
*Plaintiffs/Appellants*,

v.

GINA RAIMONDO, et al.,
*Defendants/Appellees*,

and

COASTAL CONSERVATION ASSOCIATION, et al.,
*Intervenors/Appellees*.

Appeal from the United States District Court for the District of Columbia
No. 22-cv-1260 (Hon. Timothy J. Kelly)

**BRIEF FOR APPELLEES**

TODD KIM
*Assistant Attorney General*

AMANDA C. LEITER
*Senior Counsel*
Of Counsel:                                    ASTRID STUTH CEVALLOS
                                               DANIEL HALAINEN
MARA LEVY                                      *Attorneys*
*Attorney*                                     Environment and Natural Resources Division
Office of the General Counsel                  U.S. Department of Justice
National Oceanic & Atmospheric                 Post Office Box 7415
    Administration                             Washington, D.C. 20044
                                               (202) 307-2711
                                               Amanda.Leiter@usdoj.gov

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

**A.    Parties and Amici**

All parties, intervenors, and amici appearing before the district court and in this court are listed in the Brief for Appellants.

**B.    Rulings Under Review**

References to the rulings at issue appear in the Brief for Appellants.

**C.    Related Cases**

There are no related cases within the meaning of Circuit Rule 28(a)(1)(C).

/s/ *Amanda C. Leiter*
AMANDA C. LEITER

Counsel for Appellees

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............................................................................................i

TABLE OF AUTHORITIES .......................................................iv

GLOSSARY ............................................................................ix

INTRODUCTION ....................................................................1

STATEMENT OF JURISDICTION.............................................3

STATEMENT OF THE ISSUES.................................................3

PERTINENT STATUTES AND REGULATIONS ...........................4

STATEMENT OF THE CASE....................................................4

    A.    Statutory and regulatory background ..................................4

    B.    Factual background ........................................................10

        1.    Pre-Amendment 53 regulation of the fishery ..........10

        2.    Development of Amendment 53................................14

            a.    Recreational fishing activity estimates............15

            b.    Stock health estimates ..................................19

            c.    Amendment 53..............................................20

    C.    Proceedings below..........................................................24

SUMMARY OF ARGUMENT ..................................................26

STANDARD OF REVIEW .......................................................29

ARGUMENT .......................................................................30

I.      The Allocation Ratio Set in Amendment 53 Promotes the
        Conservation of the Red Grouper Stock ........................................................30

II.     Amendment 53 Minimizes Bycatch and Bycatch Mortality to
        the Extent Practicable Given the Competing Priority of Right-
        Sizing the Recreational Fishery .................................................................36

III.    Amendment 53 Includes Catch Limits and Accountability
        Measures for Dead Discards ..........................................................................40

IV.     The Fisheries Service Rationally Explained Its Reliance on the
        Challenged Economic Analysis .....................................................................43

CONCLUSION ....................................................................................................49

CERTIFICATE OF COMPLIANCE ....................................................................51

# TABLE OF AUTHORITIES

## Cases

*Commc'ns LLC v. Fed. Commc'ns Comm'n*,
  875 F.3d 1117 (D.C. Cir. 2017) ................................................... 45

*Envt'l Def. Fund, Inc. v. Costle*,
  657 F.2d 275 (D.C. Cir. 1981) .................................................... 46

*Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ...................................................... 45, 46, 47

*Flaherty v. Bryson*,
  850 F. Supp. 2d 38 (D.D.C. 2012) .............................................. 39

*Gen. Category Scallop Fishermen v. Sec'y, U.S. Dep't of Commerce*,
  635 F.3d 106 (3rd Cir. 2011) ...................................................... 5

*Gen. Chem. Corp. v. United States*,
  817 F.2d 844 (D.C. Cir. 1987) .................................................... 47

*Groundfish Forum v. Ross*,
  375 F. Supp. 3d 72 (D.D.C. 2019) .............................................. 35

*Nat'l Ass'n of Clean Water Agencies v. Envtl. Prot. Agency*,
  734 F.3d 1115 (D.C. Cir. 2013) ............................................ 34, 41

*Oceana, Inc. v. Gutierrez*,
  488 F.3d 1020 (D.C. Cir. 2007) .................................................. 36

*Oceana, Inc. v. Locke*,
  670 F.3d 1238 (D.C. Cir. 2011) .................................................. 29

*Oceana, Inc. v. Locke*,
  831 F. Supp. 2d 95 (D.D.C. 2011) .............................................. 43

*RadNet Mgmt., Inc. v. Nat'l Lab. Rels. Bd.*,
  992 F.3d 1114 (D.C. Cir. 2021) .................................................. 46

*Safari Club Int'l v. Zinke*,
    878 F.3d 316 (D.C. Cir. 2017).......................................................29

*The Ocean Conservancy v. Gutierrez*,
    394 F. Supp. 2d 147 (D.D.C. 2005).............................................36

*Util. Air Regulatory Grp. v. Envtl. Prot. Agency*,
    573 U.S. 302 (2014).....................................................................32

*Wisconsin v. Envtl. Prot. Agency*,
    938 F.3d 303 (D.C. Cir. 2019).....................................................31

## Statutes and Court Rules

Administrative Procedure Act
    5 U.S.C. § 701.................................................................................3

    5 U.S.C. § 706(2)(A) .....................................................................29

Magnuson-Stevens Act
    16 U.S.C. § 1801.............................................................................3

    16 U.S.C. § 1801(a)(6) ...................................................................4

    16 U.S.C. § 1801(b).........................................................................4

    16 U.S.C. § 1801(b)(1) ...................................................................4

    16 U.S.C. § 1801(b)(3) ...................................................................4

    16 U.S.C. § 1802(2).........................................................................8

    16 U.S.C. § 1802(5).......................................................................31

    16 U.S.C. § 1802(33)(A) ...........................................................7, 31

    16 U.S.C. § 1802(33)(B) .................................................................7

    16 U.S.C. § 1802(34).......................................................................7

16 U.S.C. § 1802(38) ........................................................................8

16 U.S.C. § 1851(a) ....................................................................6, 30

16 U.S.C. § 1851(a)(1) .........................................................7, 31, 37

16 U.S.C. § 1851(a)(2) ....................................................................7

16 U.S.C. § 1851(a)(4) ...............................................................7, 37

16 U.S.C. § 1851(a)(4)(B) .............................................................30

16 U.S.C. § 1851(a)(5) ..................................................................37

16 U.S.C. § 1851(a)(6) ..................................................................37

16 U.S.C. § 1851(a)(7) ..................................................................37

16 U.S.C. § 1851(a)(8) .............................................................31, 37

16 U.S.C. § 1851(a)(9) ...............................................................8, 36

16 U.S.C. § 1851(a)(10) ................................................................37

16 U.S.C. § 1851(b) .........................................................................6

16 U.S.C. § 1852 ..............................................................................5

16 U.S.C. § 1852(b)(1) .....................................................................5

16 U.S.C. § 1852(b)(2)(A) ................................................................5

16 U.S.C. § 1852(g) ..........................................................................9

16 U.S.C. § 1852(h)(1) .....................................................................5

16 U.S.C. § 1852(h)(6) ......................................................................9

16 U.S.C. § 1853(a)(1)(A) ................................................................6

16 U.S.C. § 1853(a)(5) ............................................................8

16 U.S.C. § 1853(a)(15) ...........................................10, 24, 25, 40

16 U.S.C. § 1853(c) ...............................................................5

16 U.S.C. § 1854.................................................................4

16 U.S.C. § 1854(a)(1)(B) .....................................................6

16 U.S.C. § 1854(a)(3) .........................................................6

16 U.S.C. § 1855(d).............................................................4

16 U.S.C. § 1855(f).............................................................29

16 U.S.C. § 1881(g)(3) .........................................................8

28 U.S.C. § 1291 ................................................................3

28 U.S.C. § 1331 ................................................................3

Fishery Conservation and Management Act,
    Pub L. No. 94-265, 90 Stat. 331 (1976) ........................................4

Magnuson Stevens Fishery Conservation and Management
    Reauthorization Act of 2006,
    Pub. L. No. 109-479, 120 Stat. 3575 (Jan. 12, 2007) ...........................8

## Federal Regulations

50 C.F.R. § 600.305-600.355....................................................6

50 C.F.R. § 600.305(d)(3).....................................................37

50 C.F.R. § 600.310(e)(2)(i)(B)................................................7

50 C.F.R. § 600.310(e)(2)(i)(D)................................................9

50 C.F.R. 600.310(e)(3)(i)-(ii)...............................................7

50 C.F.R. § 600.310(f) ..........................................................................8

50 C.F.R. § 600.310(f)(1)(ii) ................................................................9

50 C.F.R. § 600.310(f)(1)(iii) ...............................................................9

50 C.F.R. § 600.310(f)(4)(i) ..................................................................9

50 C.F.R. § 600.310(g)(1) ...................................................................10

50 C.F.R. § 600.310(g)(4) .....................................................................9

50 C.F.R. § 600.350(d)(3) ...................................................................37

50 C.F.R. § 622.39(a)(1)(iii)(C) ..........................................................24

50 C.F.R. § 622.41(e)(1) ......................................................................24

50 C.F.R. § 622.41(e)(2) ......................................................................41

50 C.F.R. § 622.41(e)(2)(iv) ................................................................24

49 Fed. Reg. 39,548 (Oct. 9, 1984) ....................................................10

76 Fed. Reg. 11,373 ............................................................................39

84 Fed. Reg. 22.389 (May 17, 2019) ..................................................11

84 Fed. Reg. 52,036 (October 1, 2019) ..............................................11

# GLOSSARY

| | |
|---|---|
| 2019 Stock Report | Southeast Data, Assessment, and Review (SEDAR) 61 |
| Amendment 53 | Final Amendment 53 to the Fishery Management Plan for the Reef Fish Resources of the Gulf of Mexico |
| Council(s) | Regional Fishery Management Council(s) |
| Fisheries Service | National Marine Fisheries Service |
| Gulf | Gulf of Mexico |
| Gulf Council | Gulf of Mexico Fishery Management Council |
| Gulf Management Plan | Fishery Management Plan for the Reef Fish Resources of the Gulf of Mexico |
| Magnuson-Stevens Act | Magnuson-Stevens Fishery Conservation and Management Act |
| New units | MRIP-FES units used by the Fisheries Service to reflect updated estimates of recreational fishing activity |
| Scientific Committee | Gulf of Mexico Fishery Management Council, Scientific and Statistical Committee |
| Secretary | U.S. Secretary of Commerce |

## INTRODUCTION

Pursuant to the Magnuson-Stevens Fishery Conservation and Management Act, the National Marine Fisheries Service works with regional Fishery Management Councils to develop and implement conservation and management programs for federally regulated fisheries, and to promote domestic commercial and recreational fishing industries. In 2022, the Fisheries Service adopted a rule to revise the regulations governing conservation and management of the Gulf of Mexico red grouper fishery to account for two new datasets: a 2019 stock assessment that suggests harvest reductions are necessary to protect the red grouper breeding stock, and new estimates of recreational fishing activity that indicate historical landings (and discards) in the sector are higher than previously thought.

The Fisheries Service adopted this rule to implement fishery management changes developed by the Gulf of Mexico Fishery Management Council and known as Final Amendment 53 to the Fishery Management Plan for the Reef Fish Resources of the Gulf of Mexico. As relevant here, Amendment 53 makes two key changes to red grouper management. First, the Amendment reduces all applicable red grouper fishing limits. Second, it allocates the resulting allowable catch between the commercial and recreational sectors in a manner that reflects the Fisheries Service's new understanding of each sector's historical participation in the fishery.

1

Plaintiffs, commercial fishermen and two trade organizations, allege that Amendment 53 violates the Magnuson-Stevens Act and the Administrative Procedure Act. Specifically, they argue the Amendment fails to promote conservation, fails to minimize red grouper discards, and fails to set limits or otherwise account for discards of dead fish, all in violation of the Magnuson-Stevens Act, and the Amendment relies on a flawed economic analysis, in violation of the Administrative Procedure Act.

The district court correctly rejected these arguments. In fact, the Fisheries Service undertook a thorough evaluation of the available scientific and economic information in selecting among management alternatives. The final overfishing limit, annual catch limit, and catch allocations reflect the Service's new understanding of historical recreational fishing activity; they account for the state of the red grouper stock by evenly reducing both the commercial and the recreational sectors' allowable landings; and they also reasonably consider a variety of other relevant factors, including dead discards from the fishery, as well as two recent and severe toxic red algal blooms.

The Fisheries Service's science-based fishery management decisions are reasonable and entitled to respect. This Court should affirm the district court.

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arose under the Administrative Procedure Act, 5 U.S.C. §§ 701 et seq., and the Magnuson-Stevens Act, 16 U.S.C. §§ 1801 et seq.  Joint Appendix (J.A.) __; ECF 1.  This Court has jurisdiction under 28 U.S.C. § 1291 because the district court's final judgment, entered on January 6, 2023, disposes of all parties' claims.  J.A. __; ECF 45.  Plaintiffs timely filed their notice of appeal on February 3, 2023.  J.A. __; ECF 48.

## STATEMENT OF THE ISSUES

1.    Whether the Fisheries Service complied with the Magnuson-Stevens Act when it reasonably responded to a new red grouper stock assessment and new estimates of recreational fishing activity by using peer-reviewed models to recalibrate the historical data on which catch allocation is based; reducing the overall catch limit to account for both those data and the best scientific information about the state of the stock; and reducing the commercial and recreational sectors' landings allocations by approximately equal proportions (20% and 18% respectively).

2.    Whether the Service acted reasonably when it relied on sound science and economic modeling to adopt a rule that will achieve the greatest overall benefit

to the Nation, particularly with respect to food production and recreational

opportunities, but also considering other economic, social, and ecological factors.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are set forth in the Brief for Appellants.

## STATEMENT OF THE CASE

### A.     Statutory and regulatory background

The Magnuson-Stevens Act governs the conservation and management of

United States marine fishery resources. *See generally* 16 U.S.C. § 1801(b).

Enacted in 1976,[1] the Act aims not only "to conserve and manage the fishery

resources found off the coasts," but also "to promote domestic commercial and

recreational fishing under sound conservation and management principles." *Id.*

§ 1801(b)(1), (3). To accomplish these goals, the Act authorizes the Secretary of

Commerce to implement a comprehensive fishery management program "to

prevent overfishing, to rebuild overfished stocks, to ensure conservation, to

facilitate long-term protection of essential fish habitats, and to realize the full

potential of the Nation's fishery resources." *Id.* § 1801(a)(6); *see also id.* §§ 1854,

1855(d). The Secretary has delegated authority to administer the Act to the

---

[1] Congress first enacted the statute as the Fishery Conservation and Management
Act, Pub L. No. 94-265, 90 Stat. 331 (1976).

National Marine Fisheries Service, a division of the National Oceanic and Atmospheric Administration.

To assist the Fisheries Service in this administration, the Magnuson-Stevens Act establishes eight Regional Fishery Management Councils and charges them with developing conservation and management measures consistent with the Act's policies. 16 U.S.C. § 1852.  Each Council includes federal, state, and territorial fishery management officials, as well as individuals "knowledgeable" about fishery resources within the relevant geographic area, who are nominated by state governors and appointed by the Secretary. *Id.* § 1852(b)(1), (b)(2)(A). The Councils do not have regulatory authority and are not federal agencies for purposes of the Administrative Procedure Act.  *See, e.g.*, *Gen. Category Scallop Fishermen v. Sec'y, U.S. Dep't of Commerce*, 635 F.3d 106, 112 n.15 (3rd Cir. 2011).

Under the Magnuson-Stevens Act, the Councils develop a variety of fishery management approaches and submit them to the Fisheries Service for implementation. Specifically, the Councils prepare management plans "for each fishery under [their] authority that requires conservation and management"; any amendments to those plans that are "necessary," 16 U.S.C. § 1852(h)(1); and any proposed regulations that the relevant Council "deems necessary or appropriate" to implement or modify implementation of the plan or plan amendment, *id*. § 1853(c). When a Council transmits a fishery management plan to the Fisheries Service, the

5

agency publishes a notice of availability in the Federal Register and opens a

comment period. 16 U.S.C. § 1854(a)(1)(B). After the comment period closes, the

Fisheries Service must approve, disapprove, or partially approve the plan based on

its consistency with law. *Id*. § 1854(a)(3). The Fisheries Service follows a similar

process to implement plan amendments—publishing a proposed rule, soliciting

public comment, and promulgating a final implementation rule. *Id*.

§ 1854(a)(1)(B), (a)(3).

      The Magnuson-Stevens Act requires that fishery management plans contain

measures "necessary and appropriate for the conservation and management of the

fishery, to prevent overfishing and rebuild overfished stocks, and to protect,

restore, and promote the long-term health and stability of the fishery." *Id*.

§ 1853(a)(1)(A). In addition, all fishery management plans and implementing

regulations must "be consistent" with ten "national standards for fishery

conservation and management." *Id*. § 1851(a). Fisheries Service guidelines inform

the implementation of the ten national standards. *See id*. § 1851(b) (providing for

advisory guidelines that do not have force and effect of law); 50 C.F.R.

§§ 600.305-600.355 (setting out the guidelines).

      The four standards most relevant here are National Standards 1, 2, 4, and 9.

National Standard 1 states that fishery management measures "shall prevent

overfishing while achieving, on a continuing basis, the optimum yield from each

fishery for the United States fishing industry." 16 U.S.C. § 1851(a)(1). Elsewhere, the Act defines "overfishing" as the rate or level of fishing mortality that jeopardizes the fishery's "capacity …. to produce the maximum sustainable yield on a continuing basis." *Id.* § 1802(34). *See also* 50 C.F.R. § 600.310(e)(2)(i)(B)-(C) (defining overfishing). The "optimum … yield from a fishery" means, in relevant part, "the amount of fish which …. will provide the greatest overall benefit to the Nation, particularly with respect to food production and recreational opportunities," but also "taking into account the protection of the marine ecosystems," 16 U.S.C. § 1802(33)(A), as well as "any relevant economic, social, or ecological factor," *id.* § 1802(33)(B). The Fisheries Service guidelines further explain that "optimum yield" reflects the "long-term average amount of desired yield from a stock, stock complex, or fishery." 50 C.F.R. 600.310(e)(3)(i)-(ii).

National Standard 2 establishes the scientific standard for the Fisheries Service's work: "Conservation and management measures shall be based upon the best scientific information available." 16 U.S.C. § 1851(a)(2).

National Standard 4 relates to situations, as here, when a fishery must be "allocate[d] or assign[ed] … among various United States fishermen." *Id.* § 1851(a)(4). Under that standard, any such allocation must be "fair and equitable" and "reasonably calculated to promote conservation." *Id.*

Finally, under National Standard 9, fishery management measures included in a plan "shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch." *Id.* § 1851(a)(9). The term "bycatch" refers to fish that are harvested in a fishery but neither kept nor sold; it includes fish that are discarded because they exceed catch limits or fall short of minimum size requirements specified in the relevant fishery management plan. *Id.* § 1802(2), (38) (defining bycatch and regulatory discards).

To inform the Fisheries Service's and Councils' efforts to conserve and manage fisheries, prevent overfishing, and minimize bycatch, the Magnuson-Stevens Act requires that fishery management plans specify data that all sectors of the fishery "shall … submit[]" to the Fisheries Service regarding fishing activity and the size and nature of the catch. 16 U.S.C. § 1853(a)(5). Importantly for this case, in 2007, Congress recognized the need to improve estimates of recreational catch and bycatch and directed the Fisheries Service to revise its methodology for assessing activity in that sector. *Id.* § 1881(g)(3) (added to the Act via the Magnuson Stevens Fishery Conservation and Management Reauthorization Act of 2006, Pub. L. No. 109-479, 120 Stat. 3575 (Jan. 12, 2007)).

One further set of provisions is relevant here. Under the National Standard 1 guidelines, the Regional Councils develop, and the Fisheries Service implements, a variety of annual catch limits for regulated fisheries. *See* 50 C.F.R. § 600.310(f).

The three red grouper limits most relevant in this case are the overfishing limit, the acceptable biological catch, and the annual catch limit.

Developed by a Regional Council's Scientific and Statistical Committee,[2] the "[o]verfishing limit" estimates the maximum annual catch that the relevant stock could sustain. 50 C.F.R. § 600.310(e)(2)(i)(D). The "[a]cceptable biological catch" accounts for any scientific uncertainty (including "uncertainty in the estimate of the overfishing limit"); it cannot exceed the overfishing limit. *Id.* § 600.310(f)(1)(ii). Finally, the "[a]nnual catch limit" accounts for any uncertainty about the efficacy of fishery management efforts; it "cannot exceed" the acceptable biological catch. *Id.* § 600.310(f)(1)(iii), (f)(4)(i).[3] The annual catch limit is the operational limit, and it may be divided between fishery sectors—as, in this case, between the commercial and recreational red grouper sectors. *Id.*, § 600.310(f)(1)(iii); *see also* J.A. __; AR 17419.

Section 303(a)(15) of the Magnuson-Stevens Act requires that fishery management plans include "measures to ensure accountability" with these catch

---

[2] *See* 16 U.S.C. § 1852(g) (requiring establishment of committee to provide Council with scientific advice for fishery management). A council may not identify annual catch limits that exceed the fishing level recommendations of its Scientific Committee. 16 U.S.C. §1852(h)(6).

[3] The optional "annual catch target" discussed in Amendment 53 and various documents in the administrative record, *see, e.g.*, J.A. __; AR 7989, further accounts for management uncertainty, 50 C.F.R. § 600.310(g)(4), but is not at issue in this case.

limits. 16 U.S.C. § 1853(a)(15). These "accountability measures"—which may include closure of an entire fishery, closure of a particular area, or abbreviation of the current or a future fishing season—serve to "prevent [annual catch limits], including sector-[annual catch limits], from being exceeded, and to correct or mitigate overages … if they occur." 50 C.F.R. § 600.310(g)(1).

### B.    Factual background

#### 1.    Pre-Amendment 53 regulation of the fishery

Red grouper are found primarily in hard-bottom areas of the Eastern Gulf. J.A. __; AR 17419. The stock supports large commercial and recreational fisheries, which the Fisheries Service and Gulf Council manage under the Fishery Management Plan for the Reef Fish Resources of the Gulf of Mexico. *Id.* As relevant here, that Plan sets the overfishing limit, acceptable biological catch, and annual catch limit for red grouper, and it also allocates allowable landings between the commercial and recreational sectors of the red grouper fishery. *Id.*; *see also* 49 Fed. Reg. 39548 (Oct. 9, 1984) (implementing the original Gulf Management Plan).

For more than two decades, the Fisheries Service has been working to rebuild the red grouper population in the Gulf, after a 1999 assessment indicated the stock was overfished. J.A. __; AR 7974. A significant toxic red algal bloom (or "red tide") in 2005 contributed to the problem, "depress[ing] the red grouper

spawning stock biomass," J.A. __; AR 8003, but a few years later, in 2007, the Fisheries Service determined that the stock was rebuilt. J.A. __; AR 7974.

In recent years, however, the Gulf Council again became concerned about the state of the stock, due both to reports from fishermen suggesting that actual 2017 harvests were well below allowable levels and to two additional and severe red tide events in 2014 and 2018. J.A. __; AR 7965, 8003. In 2019, therefore, the Fisheries Service set the red grouper annual catch limit at the level of the 2017 harvest (4.16 million pounds), first on an emergency and then on a permanent basis J.A. __; AR 17419 (citing 84 Fed. Reg. 22389 (May 17, 2019) (final temporary rule) and 84 Fed. Reg. 52036 (October 1, 2019) (final rule)).

Prior to the adoption of Amendment 53, the Fisheries Service relied on Amendment 30B to allocate the overall red grouper catch limit between the commercial and recreational sectors. *See* J.A. __; AR 17419; 10410-10871 (final Amendment 30B). Approved and implemented in 2009, Amendment 30B assigned 76% of the allowable landings to the commercial sector and 24% to the recreational sector. J.A. __; AR 7975. That allocation ratio corresponded to the Fisheries Service's then-current estimate of each sector's historical average annual landings from 2005 back to 1986 (the first year that red grouper were identified at the species level in commercial landings). *Id*. In 2019, application of that allocation ratio to the reduced annual catch limit of 4.16 million pounds resulted in a

commercial annual catch limit of 3.16 million pounds, and a recreational annual catch limit of 1.00 million pounds. J.A. __; AR 7965.

To implement the commercial and recreational sectors' annual red grouper catch limits, the Fisheries Service relies on sector-specific management strategies. For the commercial fishery, the Service administers an individual fishing quota program, under which a commercial operator harvesting red grouper from federal waters in the Gulf must hold both a Gulf reef fish permit and a tradeable red grouper allocation. J.A. __; AR 8003. From 2014 to 2018, between 374 and 384 commercial vessels annually harvested red grouper. J.A. __; AR 17420. Each red grouper shareholder receives an annual allocation of the commercial quota (also known as a "catch allowance") on January 1 of the relevant year. J.A. __; AR 8003. A minimum size limit also applies in the commercial sector: operators may not harvest red grouper smaller than 18 inches in length. J.A. __; AR 8004.

Different restrictions apply to the recreational sector, in part because unlike commercial operators, recreational sector participants "tend to seek to maximize access and opportunities," rather than total harvest. J.A. __; AR 17309. The recreational fishery comprises both charter boats and private anglers who fish from shore or from private boats. J.A. __; AR 8047. Recreational anglers are not

required to hold a federal permit[4] to fish for or harvest red grouper, but a charter

boat operating in federal waters must hold a federal Gulf reef fish for-hire permit.

J.A. __; AR 8053. As of 2020, approximately 1200 such permits had been issued.

*Id.* Other relevant federal limits on the recreational sector include a 20-inch

minimum size, a two-month winter closure to protect the fish during spawning

season, a bag limit of two red grouper per trip, and restrictions on the types of gear

that may be used. J.A. __; AR 8007, 8176, 8178-79.

Another important consideration in regulating the red grouper fishery is the

issue of bycatch. Even as the various size, catch, season, and gear limits protect the

red grouper stock, they create significant bycatch and bycatch mortality, because

fishermen must discard undersize fish, fish caught out of season, or fish that

exceed the catch quota or violate other restrictions, and some of those discards do

not survive. J.A. __; AR 8178-79. Assessing the implications of red grouper

bycatch—and particularly bycatch mortality—is necessarily inexact, due to

difficulties in estimating both the number of fish caught and then released, and the

fate of those fish. *See generally* J.A. __; AR 8169-873 (noting, among other

problems, "concerns over the reliability" of self-reported discard rates in the

commercial sector); J.A. __; AR 18595 (discussing the variables that affect discard

---

[4] Various state regulations govern harvest of red grouper in state waters, but those
are not at issue here. *See, e.g.*, J.A. __; AR 10550-554 (noting the differing federal
and state regulation of Gulf reef fish).

mortality, including the fishing mode, the depth of the catch, and the temperature profile of the water column). In spite of these difficulties, the Fisheries Service generates annual estimates of bycatch and bycatch mortality in each sector, broken down by fishing mode (for example, charter boat versus private angler). J.A. __; AR 8169-173. "Generally, a fish caught and released by a recreational fisherman has a greater likelihood of survival" than a fish caught and released by a commercial operator, due to differences in catch depth and other factors. J.A. __; AR 17420. Because the recreational sector "discards substantially more fish," however, "the recreational sector is responsible for more discards and more dead discards." J.A. __; AR 8173.

### 2.    Development of Amendment 53

The Gulf Council developed Amendment 53 to the Gulf Management Plan in 2021, to address conservation and management of the red grouper stock. The impetus for development of Amendment 53 was twofold. First, between 2008 and 2018, the Fisheries Service developed a new, more accurate approach to estimating recreational fishing activity and bycatch, and the new approach exposed flaws in the historical red grouper landings data on which Amendment 30B had based the 76% -commercial to 24%-recreational allocation ratio. Second, the Service completed a new stock assessment for Gulf red grouper, which indicated that

14

harvest reductions are necessary because the spawning stock biomass is below target levels. J.A. __; AR 17286; *see also* J.A. __; AR 12270-78.

### a.    Recreational fishing activity estimates

The Fisheries Service uses individual fishing quota data to assess the magnitude of commercial landings, *see* J.A. __; AR 7978, but it must estimate recreational landings based on survey data. At the simplest level, the Fisheries Service's update to its recreational landings and bycatch estimates involved improvements in survey design. Two types of data are necessary to assess recreational landings: the number and duration of trips taken per day (so-called "fishing effort"), and the number of fish caught (and kept or discarded) per trip of average duration (landings and bycatch). J.A. __; AR 7977; 18843-76 (summary slides about the new survey methods). Prior to 2008, the Fisheries Service relied on a system of landline telephone surveys to estimate fishing effort, and "onsite interviews at marinas and other points where recreational anglers fish" to gauge landings and bycatch. *Id*. But in response to Congress's 2007 directive, discussed above, the Service created a new Marine Recreational Information Program, which developed and tested an improved approach to both aspects of the assessment. *Id.*; *see also* J.A. __; AR 18642-87 (Marine Recreational Information Program: Implementation Plan (Oct. 2008)).

The new approach to assessing fishing effort, known as the Fishing Effort Survey, replaced the prior system—"random-digit dialing of homes in coastal counties"[5]—with a mail-based system that relies on state angler license and registration information to identify households to target. J.A. __; AR 7977-78. The shift was intended to correct for both the over-inclusiveness of the past approach ("because relatively few households include active anglers") and its under-inclusiveness ("because some anglers do not live in coastal counties, or they live in coastal counties but do not have landline telephones"). J.A. __; AR 18673; *see also* 18914-22 (describing the Fishing Effort Survey and the statistical techniques used to fill in missing data). The Service phased in the new approach over a period of years, transitioning fully in 2018. J.A. __; AR 7977.

To improve its estimates of the other important inputs to recreational activity assessments (namely, recreational landings and releases per trip), the Fisheries Service made a variety of changes to the design of the survey that federal interviewers used to collect information from returning anglers. To take just two examples, the prior survey design did not adequately measure nighttime landings and releases, nor landings and releases on private shoreline or private docks that

---

[5] The Administrative Record refers to this prior information collection system as the Coastal Household Telephone Survey, or CHTS. *E.g.*, J.A. __; AR 17420.

16

surveyors could not access.[6] J.A. __; AR 7977, 18665-66. The new survey design, implemented in 2013 and known as the Access Point Angler Interview Survey, corrected for these omissions. *See, e.g.*, J.A. __; AR 18665-66; 18788; 18795-96, 18820; 18893-913 (describing the new survey approach and the statistical techniques used to correct for data gaps).

Once the Fisheries Service had fully implemented both the Fishing Effort Survey (effort) and the Access Point Angler Interview Survey (landings), and multiplied those numbers to estimate the recreational fishery's total annual landings, J.A. __; AR 18844 (illustrating the calculation), a problem became apparent: the new recreational activity estimates were "generally higher" than past estimates, J.A. __; AR 17420. As the Fisheries Service emphasizes, this difference does not reflect "a sudden increase in fishing effort," but the implementation of survey techniques "designed to more accurately measure fishing activity." *Id.* In other words, the Fisheries Service realized that it had, for decades, significantly underestimated the magnitude of recreational red grouper fishing activity, and consequently, that it had also underestimated the magnitude of the overall red grouper harvest. *See generally* J.A. __; AR 18850-51 (illustrating the discrepancy).

---

[6] The Administrative Record refers to the prior survey used to assess recreational landings and discards as the Marine Recreational Fisheries Statistics Survey, or MRFSS. *E.g.*, J.A. __; AR 17420.

The next step was to go back and correct the old data. To do this, the Fisheries Service developed peer-reviewed calibration models that enabled it to scale up the historical estimates of recreational fishing activity into new Marine Recreational Information Program-Fishing Effort Survey "units."[7] *See* J.A. __; AR 17420 (using the term "units" and citing the calibration studies); J.A. __; AR 18688-721 (Fishing Effort Survey Calibration Review; J.A. __; AR 18722-842 (Access Point Angler Interview Survey (APAIS) Calibration Peer Review). Translating past estimates of recreational fishing activity into these new units produces a more accurate estimate of the fishing activity that was actually occurring at the time the original data were collected. J.A. __; AR 17420. Updated historical estimates, recalibrated and expressed in the new units, constitute the "the best scientific information available" on past recreational landings and releases. *Id.*

The Fisheries Service therefore used the calibration models to reassess historical recreational fishing activity levels, including the 1986-2005 data set on which Amendment 30B had based its 76%-commercial to 24%-recreational allocation ratio. Unsurprisingly, that exercise established that during this 19-year reference period, total red grouper landings (commercial plus recreational) were significantly higher than the Fisheries Service had thought. Moreover, the

---

[7] The Administrative Record refers to these new units by the acronym "MRIP-FES." *E.g.*, J.A. __; AR 17420.

recreational sector did not account for just 24% of those landings, but 40.7%, with the commercial sector therefore accounting for just 59.3% of landings over the same period. J.A. __; AR 17420.

Finally, the Fisheries Service noted that the units issue affected not only the estimates of historical recreational activity, but also the estimate of total recreational landings in 2017—the year on which the 2019 emergency catch limits were based. That is, in 2017, the Service had used the old survey approach to estimate recreational landings, and then in 2019 it had used that landings (under)estimate to set both the overall annual catch limit of 4.16 million pounds and the recreational catch limit of 1.00 million pounds. Recalibrated to reflect the recreational sector's actual 2017 activity level, those limits would be 5.26 and 2.10 million pounds, respectively. J.A. __; AR 17426.

### b.     Stock health estimates

The other key impetus for the development of Amendment 53 was the completion in 2019 of a new stock Assessment Report for the Gulf of Mexico Red Grouper.[8] J.A. __; AR 18249-533. The 2019 Stock Report determined that a 2014 red tide event killed significant portions of the spawning red grouper population, and that a subsequent 2018 red tide event likely had similarly "important

---

[8] The Administrative Record refers to this Report as SEDAR 61. *E.g.*, J.A. __; AR 17419.

implications" for the stock. J.A. __; AR 12271; *see also* J.A. __; AR 7979, 8003.

Reinforcing the former determination, commercial operators and recreational

anglers in 2017 reported a decreased abundance of red grouper in the Gulf, as well

as "more undersized red grouper than in recent years." J.A. __; AR 12271-72;

18241 ("[A]nglers indicated observing fewer Red Grouper ≥ 20 inches … total

length, and only finding fish in deeper waters than in past years.").

Based on the 2019 Stock Report, the Gulf Council's Scientific Committee

concluded that the Gulf red grouper stock "is not overfished" but remains below

the target spawning biomass. J.A. __; AR 12270. Accordingly, the Committee

recommended reducing the overfishing limit for the stock by almost two-thirds.

J.A. __; AR 17420, 7988.

### c.    Amendment 53

Amendment 53 adjusts the Gulf Management Plan to account for the new,

higher estimates of red grouper recreational landings, and the new, lower

overfishing limit for red grouper. As relevant here, the Gulf Council and Fisheries

Service considered six possible management alternatives in developing the

Amendment. J.A. __; AR 7966. The Scientific Committee reviewed overfishing

limits and acceptable biological catch for each Alternative. J.A. __; AR 7979,

8135.

**Alternative 1** would maintain the status quo—an overfishing limit of 14.16 million pounds, an acceptable biological catch of 13.92 million pounds, an annual catch limit of 4.16 million pounds (5.26 million pounds in the new units), and a 76%-24% sector allocation (59.3%-40.7% in the new units). J.A. __; AR 7987-88.

**Alternative 2** would likewise maintain the 76%-24% sector allocation. To account for the 2019 Stock Report warnings about the state of the stock, however, this alternative would revise the overfishing limit and acceptable biological catch downward to 5.35 and 4.90 million pounds, respectively. The annual catch limit would be set equal to the acceptable biological catch. J.A. __; AR 7987-88.

Alternatives 3 through 5 are slight variations on a different theme. All three alternatives would first revisit the Amendment 30B sector allocations, translating historical estimates of recreational landings into the new units and then setting a new allocation ratio based on the resulting understanding of the historical magnitude of the recreational red grouper harvest. Due to the higher bycatch mortality in the recreational sector, that new allocation ratio would, in turn, require a reduction in the overfishing limit and the acceptable biological catch, below those of Alternative 2, to protect the stock from overfishing. J.A. __; AR 7987-88. In all three alternatives, the Fisheries Service would set the annual catch limit equal to the allowable biological catch. *Id.*

21

Most relevant here, **preferred Alternative 3** would use the same 1986-2005 time series as Amendment 30B, resulting in the 59.3%-commercial to 40.7%-recreational allocation ratio mentioned above. The acceptable biological catch and overall annual catch limit would be 4.26 million pounds in the new units. J.A. __; AR 7987-88.

**Alternatives 4** and **5** would likewise adjust the allocation ratio based on a recalibrated time series of historical landings and discards (1986-2009 for Alternative 4, and 1986-2018 for Alternative 5), and then set a suitable acceptable biological catch and annual catch limit in light of the resulting allocations (60.5%-39.5% allocation and 4.30-million-pound annual catch limit for Alternative 4, and 59.7%-40.3% allocation and 4.28-million-pound annual catch limit for Alternative 5). J.A. __; AR 7987-88.

Finally, **Alternative 6** would fix the commercial sector's share of the total allowable catch at its pre-Amendment 53 level, 3.16 million pounds, and use that figure and the overfishing limit to back-calculate both the overall annual catch limit (4.60 million pounds in the new units) and the resulting allocation ratio (68.7%-commercial and 31.3%-recreational). J.A. __; AR 7987-88.

The below chart, based on Amendment 53's Table 2.1.1, summarizes these figures. J.A. __; AR 7988. All limits are expressed in the new units.

|  | Total Annual Catch Limit (million pounds (mp)) | Commercial: Recreational Ratio (percent) | Commercial Annual Catch Limit (mp) | Recreational Annual Catch Limit (mp) |
|---|---|---|---|---|
| Status quo* (Alternative 1) | 5.26 | unit-dependent | 3.16 | 2.10 |
| Alternative 2 | 4.90 | 76:24 | 3.72 | 1.18 |
| Alternative 3 | 4.26 | 59.3:40.7 | 2.53 | 1.73 |
| Alternative 4 | 4.30 | 60.5:39.5 | 2.60 | 1.70 |
| Alternative 5 | 4.28 | 59.7:40.3 | 2.56 | 1.72 |
| Alternative 6 | 4.60 | 68.7:31.3 | 3.16 | 1.44 |

* Row 1 represents the pre-Amendment 53 annual catch limits, recalibrated and expressed in the new units.

Ultimately, the Gulf Council selected Alternative 3, because it "best reflects" the actual "historical participation by the commercial and recreational sectors, fairly and equitably distributes the needed reduction in catch between the sectors, and provides the greatest net economic benefits to the Nation." J.A. __; AR 17424.

On April 21, 2020, the Fisheries Service published a notice of intent to prepare a draft environmental impact statement for Amendment 53, and also requested public comment on the scope of issues to be included in the statement. J.A. __; AR 8784-86. Eight months later, the Service published a notice of availability for Amendment 53 and again requested public comment. J.A. __; AR 9747-50. In January 2022, the Fisheries Service published proposed regulations implementing Amendment 53 and Alternative 3 and invited public comment on the proposed rule. J.A. __; AR 13903-08. Finally, after considering and responding to these comments, the Service adopted the regulations in a final rule promulgated on

May 2, 2022, J.A. __; AR 17419-36. The final regulations are codified at 50 C.F.R. §§ 622.39(a)(1)(iii)(C), 622.41(e)(1), and 622.41(e)(2)(iv). J.A. __; AR 17436.

### C.     Proceedings below

Plaintiffs, commercial fishermen and two trade organizations, filed suit against the Fisheries Service in May 2022 to challenge the final rule implementing Amendment 53. J.A. __; ECF 1. They made ten separate claims under three different statutes, including eight discrete provisions of the Magnuson-Stevens Act. As relevant here, Plaintiffs claimed that Amendment 53 (1) is not reasonably calculated to promote conservation, in violation of National Standard 4; (2) fails to minimize bycatch mortality, in violation of National Standard 9; (3) sets overfishing and catch limits that fail to account for dead red grouper discards, in violation of Magnuson-Stevens Act Section 303(a)(15), 16 U.S.C. § 1853(a)(15); and (4) arbitrarily and capriciously compares economic outcomes in a way that the Fisheries Service previously described as "erroneous," in violation of the Administrative Procedure Act. The State of Louisiana and the Coastal Conservation Association intervened in support of the rule. J.A. __; ECF 14 and 25.

After the Fisheries Service filed the administrative record, Plaintiffs moved for summary judgment on seven of their ten claims. J.A. __; ECF 20 at 45 n. 12. The Fisheries Service and Defendant Intervenors cross-moved for summary

judgment on all ten claims. The district court granted summary judgment for Defendants. J.A. __; ECF 45.

Only four parts of the district court's holding are relevant here. First, the district court concluded that Amendment 53 does not violate National Standard 4, because the Amendment promotes conservation by "reduc[ing] the total number of grouper that may be caught," and thereby "advanc[ing] the vitality of the red-grouper stock." J.A. __; ECF 45 at 11.

Second, with respect to National Standard 9, the district court concluded that the Fisheries Service rationally explained its decision to reallocate the allowable landings between the commercial and recreational sectors, and that it adequately accounted for the resulting bycatch implications by reducing the overall annual catch limit. J.A. __; ECF 45 at 15.

Third, the court found that Amendment 53 includes sufficient "measures to ensure accountability" with the overfishing limit and annual catch limits, as required under 16 U.S.C. § 1853(a)(15). J.A. __ (*17). The court noted that although the recreational quota is "express[ed] in landings," that landings number "accounts for other sources of fishing mortality via estimations" made using the new survey techniques. *Id.* As the Fisheries Service closes the recreational sector when "landings are projected to reach the quota," *id.*, the sector is effectively held

accountable for both landings and other sources of mortality (including dead discards) that are correlated with those landings.

Finally, fourth, the court concluded that the Fisheries Service rationally explained its approach to evaluating the projected net economic benefits of the various alternatives under consideration in Amendment 53, and reasonably concluded that the selected allocation ratio (59.3%-40.7%) and overall annual catch limit (4.26 million pounds) will generate greater net economic benefits to the Nation than the other alternatives under consideration. J.A. __ (*18).

Plaintiffs now appeal only those four holdings.

## SUMMARY OF ARGUMENT

Plaintiffs' fundamental objection to Amendment 53, discernible in each of their filings in this case, is that it significantly reduces the commercial sector's annual red grouper catch limit. In Plaintiffs' view, this reduction requires the commercial sector to bear the cost of the recreational sector's increased share of the catch, as well as its higher level of bycatch mortality. But that narrative does not accurately describe the conservation and management changes embodied in Amendment 53. In fact, the Amendment responds to a new and concerning stock assessment, and to the best scientific information available about historical activity levels in the recreational sector, by reasonably reducing the overall catch limit for

26

red grouper and then evenly distributing that reduction over *both* sectors—just as the Magnuson-Stevens Act requires.

Plaintiffs' other, statutory objections to Amendment 53 similarly fall short.

1.      First, National Standard 4 does not require the Fisheries Service to allocate the allowable catch in a way that protects the stock without regard to the health of the commercial and recreational sectors. On the contrary, the Magnuson-Stevens Act defines "conservation and management" by reference to *both* stock health *and* the food-supply and recreational benefits of the fishery. In Amendment 53, the Fisheries Service reasonably balanced these objectives, setting an annual catch limit and allocation ratio that will protect against overfishing while also assuring the continued vitality of the commercial and recreational sectors of the fishery.

2.      Plaintiffs' concern about Amendment 53's compliance with National Standard 9 is also misplaced. That standard does not require the Fisheries Service to minimize all bycatch and bycatch-related mortality, but to take all *practicable* steps to do so. As the Service recognized, that standard leaves room for consideration of other priorities related to other national standards—including, in this case, right-sizing the recreational sector in light of compelling new evidence that recreational landings had been underestimated for decades. In Amendment 53, the Fisheries Service prioritized the reallocation necessary to respond to that new

evidence. That expert policy choice is entitled to respect, particularly as Amendment 53 separately accounts for the increase in bycatch mortality that is expected to result from the reallocation by reducing the overall catch limit.

3.  Nor does Amendment 53 fail to set annual catch limits or accountability measures for dead red grouper discards. Plaintiffs correctly note that the Amendment specifies the overfishing limit in terms of landings, but the Fisheries Service derived that landings limit by reference to the 2019 Stock Report, which accounts for dead discards and other sources of red grouper mortality (including red tides). In other words, the overfishing limit established in Amendment 53 reflects the total landings that the Service predicts the red grouper stock can sustain, given both the discard mortality that the Fisheries Service expects to be associated with that level of landings and the predicted mortality from red tides and other threats. Moreover, Amendment 53 includes in-season and post-season accountability measures to mitigate or correct any overages of applicable catch limits. J.A. __; AR 17419. The Magnuson-Stevens Act does not require more.

4.  Finally, the Fisheries Service adequately explained its conclusion that it is possible to quantify and compare the economic benefits to the Nation of the various alternatives under consideration in Amendment 53, even though it is not possible to determine an allocation ratio and catch limit that would maximize those

benefits. Plaintiffs fail to establish that the Fisheries Service's approach is unreasonable. In the absence of such a showing, the agency's rational explanation and expert judgment may not be disturbed. Moreover, even if the Court finds that the Fisheries Service did not adequately support its conclusions about the relative economic benefits of the alternatives under consideration in Amendment 53, that error does not warrant vacatur because the Service provided ample other, independent justifications for its selection of Alternative 3.

## STANDARD OF REVIEW

This Court reviews de novo a district court's grant of summary judgment. *Safari Club Int'l v. Zinke*, 878 F.3d 316, 325 (D.C. Cir. 2017). When reviewing an agency action, the Court reviews "the administrative action directly, according no particular deference to the judgment of the District Court." *Id.*

The Magnuson-Stevens Act provides for judicial review of regulations pursuant to the Administrative Procedure Act's familiar standard, under which this Court "will not set aside the agency's choice of a methodology unless it is 'arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.'" *Oceana, Inc. v. Locke*, 670 F.3d 1238, 1240 (D.C. Cir. 2011) (citing 16 U.S.C. § 1855(f) and quoting 5 U.S.C. § 706(2)(A)).

## ARGUMENT

I.   **The Allocation Ratio Set in Amendment 53 Promotes the Conservation of the Red Grouper Stock**

Plaintiffs first contend that Amendment 53 violates National Standard 4. As relevant here, that standard requires that any allocation of "fishing privileges among various United States fishermen" shall be "reasonably calculated to promote conservation." 16 U.S.C. § 1851(a)(4)(B). The new red grouper allocation established in Amendment 53 satisfies this requirement, both on its own terms and in connection with the associated annual catch limits recommended by the Scientific Committee.

The Magnuson-Stevens Act does not define "conservation" as such, but it does define "conservation and management," which the national standards are expressly intended to promote. 16 U.S.C. 1851(a) (setting forth the ten "national standards for fishery conservation and management"). Specifically, the Act explains that "conservation and management" refers to:

> [A]ll of the rules, regulations, conditions, methods, and other measures (A) which are required to rebuild, restore, or maintain, and which are useful in rebuilding, restoring, or maintaining, any fishery resource and the marine environment*; and (B) which are designed to assure that—*
>
> (i) *a supply of food and other products may be taken, and that recreational benefits may be obtained, on a continuing basis*;
>
> (ii) irreversible or long-term adverse effects on fishery resources and the marine environment are avoided; and

30

> (iii) there will be a multiplicity of options available with respect to *future uses of these resources*.

16 U.S.C. § 1802(5) (emphasis added). Further, National Standard 1 provides that any "[c]onservation and management measure[] … *shall*" achieve the "optimum yield" from a managed fishery, *id.* § 1851(a)(1) (emphasis added), and the Act elsewhere defines "optimum … yield" by reference not only to "protection of marine ecosystems" but also to both "food production and recreational opportunities," *id.* § 1802(33)(A).

The Act likewise uses the word "conservation," standing alone, to refer to more than just guarding against depletion of the stock. For example, National Standard 8 describes the "conservation requirements of this chapter" as "including the prevention of overfishing and rebuilding of overfished stocks." 16 U.S.C. § 1851(a)(8). But the Act then defines "overfishing" and "overfished" by reference to the "optimum" yield of a fishery—which in turn requires the Fisheries Service to consider not only "protection of the marine ecosystems," but also "food production and recreational opportunities." 16 U.S.C. § 1802(33)(A).

As the Fisheries Service explains, J.A. __; AR 17423 (responding to Comment 8), National Standard 4's conservation mandate must be understood in the context of these other provisions of the Act. *See generally Wisconsin v. Envtl. Prot. Agency*, 938 F.3d 303, 316 (D.C. Cir. 2019) (noting that any interpretation of a statutory provision "'must account for ... the broader context of the statute as a

31

whole'") (quoting *Util. Air Regulatory Grp. v. Envtl. Prot. Agency*, 573 U.S. 302, 321 (2014)). That context makes clear that National Standard 4 does not require the Fisheries Service to make allocation decisions by reference only to the health of the stock. Rather, the exercise of implementing any new fishery management provision that is intended to promote "conservation" under the Magnuson-Stevens Act is properly understood to involve consideration of three objectives: (1) advancing the health of the stock, (2) assuring food production, *and* (3) preserving recreational opportunities.

The new allocation ratio set in Amendment 53 reasonably considers these three factors. Taking the objectives in reverse, the allocation preserves recreational opportunities by right-sizing the recreational sector to account for new data about historical landings and discards. The Fishing Effort Survey and Access Point Angler Interview Survey developed and implemented in response to Congress's 2007 directive produced new, significantly higher estimates of historical recreational fishing activity. With input from the Scientific Committee, the Fisheries Service determined that the resulting estimates represent the "best scientific information available" about the recreational sector in the Gulf, J.A. __; AR 17423—and those estimates expose that the Fisheries Service has long underestimated recreational activity and, consequently, the magnitude of the overall red grouper fishery. Rather than accounting for almost a quarter of total red

grouper landings in the Gulf, charter boats and private anglers account for about 40% of those landings. J.A. __; AR 17429. Amendment 53's reallocation of annual allowable landings corrects that longstanding error.

At the same time, Amendment 53 assures continued food production by continuing to allocate almost 60% of allowable red grouper landings to the commercial sector—in line with the Fisheries Service's revised estimates of that sector's historical share of the overall fishery. J.A. __; AR 17420. Moreover, importantly, Amendment 53 does not entirely close the commercial (or recreational) fishery to promote the health of the stock, nor pick an overall catch limit that would reduce the risk of overfishing to zero, as might have been required under a narrower reading of the term "conservation." Rather, in line with the Magnuson-Stevens Act's mandate to promote the health of both stock and fishery, Amendment 53 selects an overall catch limit that the Scientific Committee indicated will allow continued food production and recreational opportunities with only a 30% chance of allowing overfishing and triggering the associated accountability measures. J.A. __; AR 17422.

Finally, with respect to the health of the stock, Amendment 53 recognizes that setting an allocation ratio and an allowable catch limit are fundamentally intertwined exercises, because any increase in the recreational allocation increases discard mortality and affects the population structure of the stock. Plaintiffs'

33

assertion that "the 'allocative aspect' of Amendment 53 must … 'independently promote conservation,'" Brief 27 (quoting J.A. ___; ECF 46 at 22), is thus fundamentally incorrect: one can only evaluate the effects of the allocation ratio on the health of the stock by reference to *both* the ratio and the associated catch limit. *See, e.g.*, J.A. __; AR 17426 (responding to Comment 15 and explaining the implications of reallocation for both the number of discards and the "age specific population structure of the stock").

For this reason, the Gulf Council properly submitted the new allocation ratios under consideration in Alternatives 2-6 to its Scientific Committee for review, and the Scientific Committee "provided alternative catch level recommendations to the Council based on the allocation alternatives." J.A. __; AR 17420. When the Fisheries Service chose Alternative 3, therefore, it not only chose to allocate 59.3% of the annual catch to the commercial sector and 40.7% to the recreational sector, but also to set the overall catch limit at a level that, in the expert judgment of the Scientific Committee, would prevent overfishing and adequately protect the stock *given that allocation ratio*. That expert judgment is entitled to "substantial deference." *Nat'l Ass'n of Clean Water Agencies v. Envtl. Prot. Agency,* 734 F.3d 1115, 1138 (D.C. Cir. 2013) (noting the "substantial deference" given to "an agency's expert scientific judgment").

Plaintiffs' argument about the relationship between allocation and promotion of conservation relies on language in *Groundfish Forum v. Ross*, 375 F. Supp. 3d 72, 89 (D.D.C. 2019) (Kelly, J.). That decision is not binding on this Court, but in any event, nothing in *Groundfish* suggests that more was required of the Fisheries Service in this case. In the fishery management plan amendment at issue in *Groundfish*, the Fisheries Service reserved a portion of Pacific Cod landings for onshore processing in two fishing communities in the Aleutian Islands, and the Service insisted that this allocation satisfied National Standard 4's conservation requirement because the amendment "made no changes" to the overall catch limit for the fishery and was therefore "conservation-neutral." *Id.* at 90. Rejecting that argument, the district court held that the Fisheries Service could not adopt a new allocation without "articulat[ing] the conservation objectives" of the allocation itself—the mere fact that the amendment was conservation-neutral was not sufficient. *Id.* at 91.

Here, both the Fisheries Service's final rule and the text of Amendment 53 itself repeatedly highlight the Amendment's conservation objectives: Amendment 53 makes intertwined changes to the overall catch limit and the allocation of that limit in response to concerning information about the health of and natural threats to the stock, all while not only accounting for new information about historical recreational landings but also continuing to promote food production. *See, e.g.,*

J.A. __; AR 17423 (highlighting the ties between the "revised allocation and catch limits" of Amendment 53 and the conservation and management goals of the Gulf Management Plan), 8264; 9686-87. Carefully balancing those competing objectives—as the Fisheries Service reasonably did in implementing Amendment 53—is the essence of National Standard 4's conservation mandate.

## II.    Amendment 53 Minimizes Bycatch and Bycatch Mortality to the Extent Practicable Given the Competing Priority of Right-Sizing the Recreational Fishery

Plaintiffs' assertion that Amendment 53 violates National Standard 9 suffers from a similar flaw: They attempt to read the requirements of National Standard 9 in isolation, as if it created an absolute obligation to minimize bycatch and bycatch mortality. By its express terms, however, National Standard 9 imposes only an obligation to minimize bycatch and bycatch mortality "to the extent practicable." 16 U.S.C. § 1851(a)(9).

As with National Standard 4, discussed above, this significant qualification in National Standard 9 must be understood in the context of the other national standards. *See, e.g.*, *The Ocean Conservancy v. Gutierrez*, 394 F. Supp. 2d 147, 158 (D.D.C. 2005) (stating that the plaintiffs in the case had "mistakenly read National Standard 9 in a vacuum, rather than in relation to the other national standards contained in the [Magnuson-Stevens Act]"), *aff'd on other grounds sub nom. Oceana, Inc. v. Gutierrez*, 488 F.3d 1020 (D.C. Cir. 2007). Those other

36

standards require the Fisheries Service to balance minimizing of bycatch with, among other things: achieving, "on a continuing basis, the optimum yield from [the] fishery," *id.* § 1851(a)(1) (National Standard 1); accomplishing any necessary allocation of allowable landings in a manner that is "fair and equitable" and "promote[s] conservation," *id.* § 1851(a)(4) (National Standard 4); considering "efficiency in the utilization of fishery resources," *id.* § 1851(a)(5) (National Standard 5); allowing for variations among fisheries and catches, *id.* § 1851(a)(6) (National Standard 6); "where practicable," minimizing costs, *id.* § 1851(a)(7) (National Standard 7); taking into account "the importance of fishery resources to fishing communities," *id.* § 1851(a)(8) (National Standard 8); and promoting "the safety of human life at sea," *id.* § 1851(a)(10) (National Standard 10).

Further, the Fisheries Service's guidelines for implementation of National Standard 9 explain that in determining consistency with that standard, the agency should consider not only the express goal—minimization of bycatch and bycatch mortality—but also such factors as "population effects for the bycatch species; changes in the economic, social, or cultural value of fishing activities, and nonconsumptive uses of fishery resources; changes in the distribution of benefits and costs; and social effects." J.A. __; AR 17424-25 (mistakenly citing 50 C.F.R. § 600.305(d)(3) but in fact referencing 50 C.F.R. 600.350(d)(3)); *see also* J.A. __;

AR 8168 (listing factors relevant to assessing whether a conservation and
management measure complies with National Standard 9).

Despite these many competing priorities, the Fisheries Service did not forget
its bycatch minimization obligation. As noted above, the rule implementing
Amendment 53 acknowledges that red grouper bycatch and bycatch mortality are
predicted to increase as the recreational sector's relative allocation increases. J.A.
__; AR 17426. The Service aims to offset that effect by lowering the
corresponding overfishing limit, acceptable biological catch, and annual catch
limit. *Id.* With those offsets, Amendment 53 predicts that the chosen 59.3%-
commercial to 40.7%-recreational allocation will "result in a corresponding
decrease in red grouper bycatch and bycatch mortality."[9] J.A. __; AR 8182.

Further, the Fisheries Service offers ample justification for its decision not to
retain the existing 76%-commercial to 24%-recreational allocation, despite the
lower expected bycatch and bycatch mortality rates associated with that allocation
ratio. Specifically, that allocation ratio does not align with the revised estimates of
historical landings in the recreational sector. Retaining that allocation in this new
era of improved surveys of fishing effort, landings, and bycatch, therefore, would

_____

[9] The Fisheries Service does acknowledge that any decrease in overall bycatch and
bycatch mortality "may be partially mitigated by an increase in regulatory discards
by reef fishermen targeting other species, should the red grouper recreation season
need to be closed" because recreational landings approach or exceed the annual
catch limit for the sector. J.A. __; AR 8021.

impose all of "the adverse economic and social effects" of the catch reduction required by the 2019 Stock Report on the recreational sector, rather than "evenly distribut[ing]" those burdens between the recreational and commercial sectors. J.A. __; AR 17425. Moreover, the Fisheries Service reasonably concluded that revising the recreational allocation to reflect the new data about historical recreational landings was necessary to comply with National Standard 1's mandate to achieve optimum yield, which is defined to include not only food production but also "recreational opportunities." J.A. __; AR 17423.

Plaintiffs support their claim that Amendment 53 violates National Standard 9 by reference to *Flaherty v. Bryson*, 850 F. Supp. 2d 38 (D.D.C. 2012). But in *Flaherty*, the district court expressly noted that the final rule challenged in that case "address[ed] bycatch in one sentence: '[b]ycatch in the herring fishery will continue to be addressed and minimized to the extent possible.'" *Id.* at 56 (citing 76 Fed. Reg. 11373, 11374) (alterations in original). The final rule implementing Amendment 53, by contrast, refers to "bycatch," "bycatch mortality," and "dead discards" no fewer than 37 times, J.A. __; AR 17419-36, and Amendment 53 itself includes an entire appendix devoted to evaluating the effects of the six management alternatives on bycatch and bycatch mortality, J.A. __; AR 8168-90. Comparison to *Flaherty* is simply inapposite.

39

Concededly, Amendment 53 does not eliminate red grouper bycatch, as would be required if one read National Standard 9—contrary to its plain text—to mandate literal "minimiz[ation]." But that absolute goal would require the Fisheries Service to close not only all sectors of the red grouper fishery but all other Gulf reef fisheries in which someone could accidentally catch and then release a red grouper. Amendment 53 need not achieve that drastic outcome to comply with National Standard 9, and the challenged rule provides ample support for the Fisheries Service's conclusion that "[g]iven the numerous factors that the Council must consider in selecting the appropriate allocation," the selected allocation ratio and catch limits "minimize bycatch and bycatch mortality to the extent practicable." J.A. __; AR 17425.

## III.   Amendment 53 Includes Catch Limits and Accountability Measures for Dead Discards

The Gulf Management Plan, as amended by Amendment 53, also complies with the Magnuson-Stevens Act requirement that fishery management plans both specify annual catch limits "at a level such that overfishing does not occur in the fishery" and "include[e] measures to ensure accountability." 16 U.S.C. § 1853(a)(15). Specifically, the Amendment reasonably relies on the 2019 Stock Report and Scientific Committee recommendations to set the overfishing limit, acceptable biological catch, and annual catch limit at levels that account for bycatch mortality (dead discards) and for "other sources of mortality (e.g., red

40

tide)." J.A. __; AR 17422. Again, this expert judgment merits deference. *See Nat'l Ass'n of Clean Water Agencies*, 734 F.3d at 1138.

Moreover, the Fisheries Service then monitors landings and imposes "in-season and post-season accountability measures" as needed to police those limits. J.A. __; AR 17419. For the commercial sector, the individual fishing quota program serves as the accountability measure. J.A. __; AR 9684-708, 9693 (Amendment 53 Record of Decision). For the recreational sector, the Service "close[s] the … sector for the remainder of the fishing year when red grouper landings reach or are projected to reach the recreational [catch limit]." *Id.* And if recreational landings in a given year exceed that limit, the post-season accountability measure "requires [the Fisheries Service] to shorten the length of the following recreational fishing season by the amount necessary" to bring landings down under target levels. *Id.* Finally, if the Fisheries Service determines at any point that the stock is overfished, it must "reduce the [annual catch limit] by the amount of the recreational … overage in the prior year." *Id. See also* 50 C.F.R. § 622.41(e)(2) (spelling out these and other accountability measures).

Plaintiffs express concern about the effectiveness of these accountability measures for the recreational sector because Amendment 53 specifies the red grouper overfishing limit in terms of landings rather than total catch. Brief 40. Plaintiffs suggest that the choice of this metric will make it difficult for the

Fisheries Service to enforce the annual catch limit. "[W]ith no limit on dead discards," Plaintiffs insist, "no accountability measures kick in." Brief 42. But that is a straightforward math problem: the Fisheries Service developed detailed estimates of the annual bycatch and bycatch mortality in the commercial and recreational sectors (broken down further by fishing type in each sector), J.A. __; AR 8169-73, and it then factored those estimates into its calculation of the appropriate catch limits for each allocation ratio under consideration in Alternatives 1-6, J.A. __; AR 17422.

That mathematical exercise is evident in the Fisheries Service's discussion of Alternative 3. Because Alternative 3 increases the allocation to the recreational sector, the Fisheries Service reduced the overfishing limit, acceptable biological catch, and overall annual catch limit to account for the higher discard mortality in that sector. J.A. __; AR 17420 ("This higher discard mortality for the stock, as well as assumed changes to the population structure that results from more recreational harvest, results in a lower projected annual yield, which means a lower [overfishing limit], [acceptable biological catch], and total [annual catch limit]."). In other words, the Fisheries Service did not "exclud[e] dead discards from the Overfishing Limit," Brief 41; rather, it expressed that limit in terms of landings, but then set the limit at a level that builds in the anticipated level of associated bycatch and bycatch mortality.

42

Taking their challenge to the Gulf Management Plan's catch limits and accountability measures in a somewhat different direction, Plaintiffs cite *Oceana, Inc. v. Locke*, 831 F. Supp. 2d 95 (D.D.C. 2011) for the proposition that "catch monitoring" of the recreational red grouper sector is also "deficien[t]" because there are no "rigorous bycatch reporting requirements." Brief 44. But that assertion amounts to an attack on the Gulf Management Plan's bycatch reporting methodology. As the district court correctly concluded, any challenge to that methodology "concerns the whole management plan," not Amendment 53, which "'does not purport to establish a bycatch-reporting methodology … and therefore does nothing to alter the [existing] bycatch-reporting methodology.'" J.A. __; ECF 46 at 14 (quoting *Oceana*, 831 F. Supp. 2d at 114). As such, any deficiencies in reporting of recreational sector bycatch are "not properly before the Court." *Id.* In any event, it is well within the Fisheries Service's technical expertise to determine the need for specific bycatch reporting in a given fishery, when the agency is already estimating bycatch for that fishery based on landings surveys.

## IV.    The Fisheries Service Rationally Explained Its Reliance on the Challenged Economic Analysis

Finally, Plaintiffs point to a perceived discrepancy between the discussion of the economics of sector allocations in Amendment 53 and the discussion of the same subject in Amendment 28, J.A. __; AR 11881-12208, a 2015 amendment to the Gulf Management Plan. The dispute concerns the Fisheries Service's ability to

43

compare the net economic benefits of different allocation ratios and catch limits, given the differing value that commercial and recreational sector participants place on catch (and, on the flip side, the differing costs to those sectors, and to fishing communities, of reduced allowable landings).

In Amendment 28, discussing the very similarly managed red snapper fishery, the Gulf Council expressed some concern about its ability to compare benefits across different sector allocations because the commercial sector is "managed under an [individual fishing quota] system," which "constitute[s] a reasonable approximation for an efficient resource allocation," whereas the recreational sector is "open access," which is not "conducive to an efficient allocation." J.A. __; AR 11991. As Plaintiffs note, Brief 46, the Council concluded from this that "changes in net benefit estimates based on the generally accepted application of the equimarginal principle … and associated inferences about economic efficiency are erroneous," and in turn, "policy prescriptions based on such inferences would not be valid." *Id.*

Plaintiffs conclude from this 2015 statement in Amendment 28, Brief 46, that the Fisheries Service acted arbitrarily and capriciously when it stated, in the rule implementing Amendment 53, that it expected Alternative 3 "to result in the greatest net economic benefits to the Nation." J.A. ___; AR 17424.

44

But the Fisheries Service rationally explained its reasoning in that same rule. Specifically, the Service stated that Plaintiffs' confusion is based on "a misunderstanding of statements in Amendment 28." J.A. __; AR 17432. The fact that fishing privileges are not assigned in the recreational sector does thwart any effort to select a recreational sector allocation that will *maximize* "net economic benefits to the Nation," the Service explained, but that is not what Amendment 53 seeks to do. *Id.* Rather, the Amendment seeks only to compare the sector allocations in Alternatives 1-6, and the available economic data and models are sufficient to allow that comparison: "the selected sector allocation in conjunction with the resulting [annual catch limits] is expected to generate relatively greater net economic benefits to the Nation." *Id.*

Plaintiffs suggest that the statements in Amendment 28 and Amendment 53 do not clearly explain the complicated economic puzzle with which the Council was wrestling in each context. But even if Plaintiffs find the Council's discussion of these highly technical questions less than clear, the Administrative Procedure Act does not require that the agency's "decision … be a model of clarity." *Press Commc'ns LLC v. Fed. Commc'ns Comm'n*, 875 F.3d 1117, 1122 (D.C. Cir. 2017) (internal quotations and citation omitted). Courts will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14 (2009).

45

In the rule implementing Amendment 53, the Fisheries Service's path is discernible. The agency began by affirming the Council's 2015 observation that inefficiencies caused by the lack of assigned recreational fishing rights complicate the effort to identify the single best allocation ratio for the red grouper fishery. Then, the Fisheries Service disavowed any intent to make that identification, instead asserting only that comparison of the allocation ratios in Alternatives 1-6 led to the conclusion that the Alternative 3 ratio, paired with the annual catch limit recommended by the Scientific Committee, would produce greater net benefits than the other ratios under consideration. J.A. __; AR 17432. Finally, the agency asserted that its economic data and models are sufficient to support that conclusion. *Id.* That assertion, and the Fisheries Service's associated actions, are entitled to a "presumption of validity." *RadNet Mgmt., Inc. v. Nat'l Lab. Rels. Bd.*, 992 F.3d 1114, 1123 (D.C. Cir. 2021) (citing *Envt'l Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981) ("arbitrary and capricious standard of review is a highly deferential one ... which presumes the agency's action to be valid.") (cleaned up)).

Contrary to Plaintiffs' suggestion, Brief 46, *Federal Communications Commission v. Fox Television Stations* does not suggest otherwise. In that case, the Supreme Court considered the Commission's "gradually expanding[] approach" to regulating "indecent" radio broadcasts, noting "the requirement that an agency provide reasoned explanation for" a change in position. 556 U.S. at 506, 515.

Concurring in part and in the judgment, Justice Kennedy expanded on the point: "An agency cannot simply disregard contrary or inconvenient factual determinations that it made in the past, any more than it can ignore inconvenient facts when it writes on a blank slate." *Id.* at 537. But the Fisheries Service did *not* ignore past statements about its economic conundrum. Rather, it explained that Plaintiffs had misunderstood those statements, which referred only to the difficulty with *maximizing* the benefits from the allocation ratio, not to the task at hand— comparing discrete alternatives. J.A. __; AR 17432.

Further, the district court correctly determined that "[t]o the extent the Service's explanation conflicts with prior analyses, the inconsistency is not serious enough to warrant vacatur." J.A. __; ECF 46 at 35 (quoting *Gen. Chem. Corp. v. United States*, 817 F.2d 844, 855 (D.C. Cir. 1987) (suggesting that small inconsistencies may not warrant vacatur if the agency did not "rel[y] heavily" on them in reaching its decision)). The key decision facing the Fisheries Service in Amendment 53 was whether to keep the existing 76%-24% allocation ratio, as in Alternatives 1 and 2, or at least to keep the existing commercial sector landings limit, as in Alternative 6, or instead to adopt an entirely new allocation ratio and new annual catch limit based on the best scientific information available, as in Alternatives 3-5. Even if one ignores the challenged assertion that Alternative 3 will "result in the greatest net economic benefits to the Nation," J.A. ___; AR

47

17424, the rule and supporting record offer persuasive other, independent

justifications for the Fisheries Service's selection of Alternative 3 over

Alternatives 1, 2, and 6. For example:

- Alternative 1 "would not be consistent with the requirements of the Magnuson-Stevens Act because the best scientific information available … indicates the [overfishing limit and allowable biological catch] need to be revised to incorporate [the new survey] data and reflect the condition of the stock." J.A. __; AR 17421.

- "[U]nder Alternative 2 (as well as Alternative 6…), the adverse economic and social effects of the required reduction in the stock [allowable landings] would be borne entirely by the recreational sector." J.A. __; AR 17425.

- Relative to Alternatives 1, 2, and 6, Alternative 3 "will more evenly distribute the adverse economic and social effects that are expected to result from the required reduction in the total [allowable landings]." *Id.*

- Retaining the "current allocation," as called for in Alternative 2, "would increase the commercial" allowable landings by "approximately 18 percent," but would "significantly decreas[e] the recreational" landings by "approximately 44 percent." J.A. __; AR 17428.

- Finally, Alternative 3 "would best represent the historic landings for the years used in … Amendment 30B … while accounting for [the new recreational landings data]. … In addition, … this alternative would reduce the commercial and recreational [annual catch limits] by similar percentages (approximately 20% and 18% respectively)." J.A. __; AR 7995.

Thus, even if the Court is concerned that the Fisheries Service did not adequately

support its prediction that Alternative 3 will produce the greatest net economic

benefits, other assertions in the rule and the record are sufficient to support the

decision to choose Alternative 3 over the alternatives that would award

significantly more catch to the commercial sector.

The Fisheries Service's explanation of its selection of Alternative 3 over Alternatives 4 and 5, which would base the new allocation ratio on a longer timeseries of recalibrated historical landings data (1986-2005 versus 1986–2009 and 1986–2018, respectively), does not contain the same level of detail. The Service does note, however, that it first adopted accountability measures for the recreational fishery in 2006, and thus the longer timeseries alternatives "would not as accurately reflect the historical participation of the commercial and recreational sectors in the fishery." J.A. __; AR 17427, 17435. But in any event, forcing the Fisheries Service to reconsider alternatives 3-5 would not redress Plaintiffs' alleged injury—loss of catch share—because the sector landing allocations in those three alternatives "vary[] by approximately one percent." J.A. __; AR 9687.

## CONCLUSION

For the foregoing reasons, the Court should affirm the judgment below.

49

Respectfully submitted,

/s/ *Amanda Leiter*
TODD KIM
*Assistant Attorney General*

Of Counsel:

MARA LEVY
*Attorney*
Office of the General Counsel
National Oceanic & Atmospheric
    Administration

AMANDA C. LEITER
*Senior Counsel*
ASTRID STUTH CEVALLOS
DANIEL HALAINEN
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice

May 12, 2023
DJ Number 90-8-8-08562

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 10,895 words.

2.      This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface by using Microsoft Word 2016 in 14-point Times New Roman font.

/s/ *Amanda C. Leiter*
AMANDA C. LEITER

Counsel for Appellees