[ORAL ARGUMENT NOT YET SCHEDULED]

No. 23-5026

---

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

**A.P. BELL FISH COMPANY, INC**., **SOUTHERN OFFSHORE FISHING ASSOCIATION, INC.**; and **GULF OF MEXICO REEF FISH SHAREHOLDERS' ALLIANCE**,

Plaintiffs - Appellants

v.

**GINA RAIMONDO**, in her official capacity as Secretary of the United States Department of Commerce; **NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRAITON**; and **NATIONAL MARINE FISHERIES SERVICE**,

Defendants - Appellees

**COASTAL CONSERVATION ASSOCIATION** and **STATE OF LOUISIANA**,

Intervenor-Defendants - Appellees

---

On Appeal from the United States District Court for the District of Columbia
Civil Action No. 1:22-cv-01260-TJK
District Judge Timothy J. Kelly

---

**FINAL BRIEF OF INTERVENOR-DEFENDANT-APPELLEE,
STATE OF LOUISIANA**

---

**Elizabeth B. Murrill (La. #20685)**
**Solicitor General**
**Louisiana Department of Justice**
PO Box 94005
Baton Rouge, LA  70804
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 326-6766
Email: murrille@ag.louisiana.gov

**Lawrence E. Marino (La. #23206)**
**Special Assistant Attorney General**
Oats & Marino
Suite 400, Gordon Square
100 East Vermilion Street
Lafayette, LA 70501
Tel: (337) 233-1100
Email: lmarino@oatsmarino.com

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to D.C. Circuit Rule 28(a)(1), Intervenor-Defendant-Appellee, State of Louisiana, certifies the following information:

**A.      Parties and Amici**

The parties in the District Court and this Court are as follows:

| | |
|---|---|
| Plaintiffs-Appellants: | A.P. Bell Fish Company, Inc.; |
| | Southern Offshore Fishing, Inc.; and |
| | Gulf of Mexico Reef Fish Shareholder's Alliance |
| Defendants-Appellees: | Gina M. Raimondo, in her official capacity as Secretary of the United States Department of Commerce; |
| | National Oceanic and Atmospheric Administration; and |
| | National Marine Fisheries Service |
| Intervenor-Defendants-Appellees: | Coastal Conservation Association; and |
| | State of Louisiana |

The amici in the District Court and this Court are as follows:

Charter Fisherman's Association, Amicus Curiae for Plaintiffs-Appellants

The amici in this Court (only) are as follows:

Fortune Fish & Gourmet LLC, Amicus Curiae for Appellants;

National Fisheries Institute, Amicus Curiae for Appellants;

Pappas Restaurants, Inc., Amicus Curiae for Appellants; and

Restaurant Law Center, Amicus Curiae for Appellants

## B.    Ruling Under Review

The ruling at issue in this Court is D.C. District Court Judge Timothy J. Kelly's Order and Memorandum Opinion denying Plaintiffs' Motion for Summary Judgment and granting Defendants' Cross-Motion for Summary Judgment and Intervenor-Defendants' Cross-Motions for Summary Judgment, *A.P. Bell Fish Co., Inc. v. Raimondo,* Civil Action No. 1:22-cv-1260-TJK, 2023 WL 122270 (D.D.C. Jan. 6, 2023).  *See* JA-0258, ECF 45 (Order); JA-0259, ECF 46 (Memorandum Opinion).

## C.    Statement of Related Cases

Pursuant to D.C. Circuit Rule 28(a)(1)(C), undersigned counsel is not aware of any cases pending before this Court that are related within the meaning of this rule.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

TABLE OF AUTHORITIES ..................................................................... v

GLOSSARY OF ABBREVIATIONS ................................................... viii

STATUTES AND REGULATIONS ....................................................... ix

STATEMENT OF THE ISSUES FOR REVIEW ..................................... 1

STATEMENT OF THE CASE .................................................................. 3

SUMMARY OF THE ARGUMENT .................................................... 11

ARGUMENT ....................................................................................... 17

I.    The Rule satisfies National Standard 4 because it promotes conservation, correctly considering all parts of the Rule that affect distribution of fishing privileges and all requirements of the Magnuson Act. ........................... 17

    A.    Compliance with National Standard 4 is determined by reference to all aspects of the Rule that directly affect distribution of fishing privileges, including the quota-setting aspect that addresses Plaintiffs' concerns regarding the percentage-allocation aspect. .... 18

    B.    The Rule promotes conservation as required by National Standard 4 because it addresses Plaintiffs' concerns regarding the percentage-allocation aspect, and because it prevents massive impairment of recreational fishing, which is part of conservation. ......................... 20

II.   The Rule satisfies National Standard 9 because the Service considered and accounted for increased bycatch pursuant to its percentage-allocation aspect. ...................................................................... 29

III.  The Rule satisfies 16 U.S.C. § 1853(a)(15) because it sets quotas to avoid overfishing, including regarding discards. ............................................... 32

IV.   The Rule concluded that the allocation in that rule is expected to result in the greatest net economic benefits to the nation *out of the alternatives considered*, which is entirely compatible with an earlier statement that *maximizing* net economic benefits is not possible. ................................. 35

CONCLUSION ..............................................................................38

CERTIFICATE OF COMPLIANCE ....................................................40

CERTIFICATE OF SERVICE ...........................................................41

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*A.P. Bell Fish Co., Inc. v. Raimondo,* No. 1:22-cv-1260-TJK, 2023 WL 122270 (D.D.C. Jan. 6, 2023) ............................................................10

*Am. Clinical Lab. Ass'n v. Becerra*, 40 F.4th 616 (D.C. Cir. 2022).......................38

*Copper Valley Mach. Works, Inc. v. Andrus*, 653 F.2d 295 (1981) .......................22

*F.C.C. v. Fox Television Stations*, 556 U.S. 502 (2009) .........................................38

*Flaherty v. Bryson*, 850 F.Supp. 38 (D.D.C. 2012) ................................................30

*Mexican Gulf Fishing Co. v. U.S. Dep't of Commerce*, 587 F.Supp.3d 428 (E.D. La. 2/28/2022)................................................................................................28

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29 (1983)................................................................................................38

*Nat. Res. Def. Council v. Daley*, 209 F.3d 747 (D.C. Cir. 2000) ...........................26

*Oceana, Inc. Locke*, 831 F.Supp. 2d 95 (D.D.C. 2011)................................... 34, 35

*Util. Air Regulatory Grp. v. E.P.A.*, 573 U.S. 302...................................................17

*Wisconsin v. Envtl. Prot. Agency*, 938 F.3d 303 (D.C. Cir. 2019) .........................17

**Statutes**

5 U.S.C. §706(2)(A).....................................................................................................2

*16 U.S.C. §1801(a)(13)...........................................................................................ix, 22

16 U.S.C. §1801(c)(3)........................................................................................ ix, 5, 7, 24

16 U.S.C. §1802(2) ...................................................................................................18

16 U.S.C. §1802(3) ...............................................................................................ix, 3

*16 U.S.C. §1802(5) ........................................................20, 21

*16 U.S.C. §1802(33) ........................................................x, 21

16 U.S.C. §1802(37) ........................................................x, 27

*16 U.S.C. §1803(B) ........................................................21

16 U.S.C. §1851(a)(4) ........................................................26

16 U.S.C. §1851(a)(4)(B) ........................................................1

16 U.S.C. §1851(a)(9) ........................................................1, 30

16 U.S.C. §1852(h)(6) ........................................................7

16 U.S.C. §1853(a)(15) ........................................................2, 15, 25, 32, 34

50 C.F.R. §600.310(f)(3)(i) ........................................................33

50 C.F.R. §600.325(c)(1) ........................................................x, 18

50 C.F.R. §600.350(d)(3) ........................................................xi, 30

## Other Authorities

74 Fed. Reg. 17603 (April 16, 2009) ........................................................3

87 Fed. Reg. 25573 (May 2, 2022) ........................................................1, 8

BLACK'S LAW DICTIONARY ........................................................22

D.C. Circuit Rule 25 ........................................................41

D.C. Circuit Rule 28(a)(1) ........................................................i

D.C. Circuit Rule 28(a)(1)(C) ........................................................ii

D.C. Circuit Rule 32(e)(1) ........................................................40

Fed. R. App. P. 32(a)(5) .............................................................................40

Fed. R. App. P. 32(a)(6) .............................................................................40

Fed. R. App. P. 32(f) ...................................................................................40

\* authorities chiefly relied on

## GLOSSARY OF ABBREVIATIONS

**CHTS**    Coastal Household Telephone Survey – a survey used by the National Marine Fisheries Service to collect fishing effort data prior to 2018, that involved randomly calling land lines in coastal households to inquire as to their fishing activity.

**FES**     Fishing Effort Survey – a survey used by the National Marine Fisheries Service to collect fishing effort data beginning in 2018, that involves a mail survey that is targeted to licensed anglers to inquire as to their fishing activity.

## STATUTES AND REGULATIONS

Except for the following, all applicable statutes and regulations are contained

in the Brief for Appellants:

## 16 U.S.C. § 1801(a)(13), Magnuson-Stevens Conservation and Management Act, Findings, purposes and policy

(a) Findings
The Congress finds and declares the following:
…
(13) While both provide significant cultural and economic benefits to the Nation, recreational fishing and commercial fishing are different activities. Therefore, science-based conservation and management approaches should be adapted to the characteristics of each sector.

## 16 U.S.C. § 1801(c)(3), Magnuson-Stevens Conservation and Management Act, Findings, purposes and policy

(c) Policy
It is further declared to be the policy of the Congress in this chapter--
…
(3) to assure that the national fishery conservation and management program utilizes, and is based upon, the best scientific information available; involves, and is responsive to the needs of, interested and affected States and citizens; considers efficiency; draws upon Federal, State, and academic capabilities in carrying out research, administration, management, and enforcement; considers the effects of fishing on immature fish and encourages development of practical measures that minimize bycatch and avoid unnecessary waste of fish; and is workable and effective;

## 16 U.S.C. § 1802(3), Magnuson-Stevens Conservation and Management Act, Definitions

As used in this chapter, unless the context otherwise requires—
…
(3) The term "charter fishing" means fishing from a vessel carrying a passenger for hire (as defined in section 2101(30) of Title 46) who is engaged in recreational fishing.

## 16 U.S.C. § 1802(33), Magnuson-Stevens Conservation and Management Act, Definitions

As used in this chapter, unless the context otherwise requires—

…

(33) The term "optimum", with respect to the yield from a fishery, means the amount of fish which--

> (A) will provide the greatest overall benefit to the Nation, particularly with respect to food production and recreational opportunities, and taking into account the protection of marine ecosystems;
> (B) is prescribed on the basis of the maximum sustainable yield from the fishery, as reduced by any relevant social, economic, or ecological factor; and
> (C) in the case of an overfished fishery, provides for rebuilding to a level consistent with producing the maximum sustainable yield in such fishery.

## 16 U.S.C. § 1802(37), Magnuson-Stevens Conservation and Management Act, Definitions

As used in this chapter, unless the context otherwise requires—

…

(37) The term "recreational fishing" means fishing for sport or pleasure.

## 50 C.F.R. § 600.325(c)(1), National Standard 4 - Allocations

(c) Allocation of fishing privileges. [A Fishery Management Plan] may contain management measures that allocate fishing privileges if such measures are necessary or helpful in furthering legitimate objectives or in achieving the Optimum Yield, and if the measures conform with paragraphs (c)(3)(i) through (c)(3)(iii) of this section.

> (1) Definition. An "allocation" or "assignment" of fishing privileges is a direct and deliberate distribution of the opportunity to participate in a fishery among identifiable, discrete user groups or individuals. Any management measure (or lack of management) has incidental allocative effects, but only those measures that result in direct distributions of fishing privileges will be judged against the allocation requirements of Standard 4. Adoption of [a Fishery Management Plan] that merely perpetuates existing fishing practices may result in an allocation, if those practices directly distribute the opportunity to participate in the fishery. Allocations of fishing privileges include, for example, per-vessel catch limits, quotas by vessel class and gear type, different quotas or fishing seasons for recreational and commercial fishermen,

assignment of ocean areas to different gear users, and limitation of permits to a certain number of vessels or fishermen.

## 50 C.F.R. § 600.350(d)(3), National Standard 9 - Bycatch

(d) Minimizing bycatch and bycatch mortality. The priority under this standard is first to avoid catching bycatch species where practicable. Fish that are bycatch and cannot be avoided must, to the extent practicable, be returned to the sea alive. Any proposed conservation and management measure that does not give priority to avoiding the capture of bycatch species must be supported by appropriate analyses. In their evaluation, the Councils must consider the net benefits to the Nation, which include, but are not limited to: Negative impacts on affected stocks; incomes accruing to participants in directed fisheries in both the short and long term; incomes accruing to participants in fisheries that target the bycatch species; environmental consequences; non-market values of bycatch species, which include non-consumptive uses of bycatch species and existence values, as well as recreational values; and impacts on other marine organisms. To evaluate conservation and management measures relative to this and other national standards, as well as to evaluate total fishing mortality, Councils must—

   …

   (3) Select measures that, to the extent practicable, will minimize bycatch and bycatch mortality.

      (i) A determination of whether a conservation and management measure minimizes bycatch or bycatch mortality to the extent practicable, consistent with other national standards and maximization of net benefits to the Nation, should consider the following factors:

         (A) Population effects for the bycatch species.

         (B) Ecological effects due to changes in the bycatch of that species (effects on other species in the ecosystem).

         (C) Changes in the bycatch of other species of fish and the resulting population and ecosystem effects.

         (D) Effects on marine mammals and birds.

         (E) Changes in fishing, processing, disposal, and marketing costs.

         (F) Changes in fishing practices and behavior of fishermen.

         (G) Changes in research, administration, and enforcement costs and management effectiveness.

         (H) Changes in the economic, social, or cultural value of fishing activities and nonconsumptive uses of fishery resources.

         (I) Changes in the distribution of benefits and costs.

(J) Social effects.

(ii) The Councils should adhere to the precautionary approach found in the Food and Agriculture Organization of the United Nations (FAO) Code of Conduct for Responsible Fisheries (Article 6.5), which is available from the Director, Publications Division, FAO, Viale delle Terme di Caracalla, 00100 Rome, Italy, when faced with uncertainty concerning any of the factors listed in this paragraph (d)(3).

## STATEMENT OF THE ISSUES FOR REVIEW

The Issues for Review regarding the Final Rule that Plaintiffs challenge (the "Rule"), promulgated by the National Marine Fisheries Service (the "Service") at 87 Fed. Reg. 25573 (May 2, 2022), JA-5814, AR 17419-17436, to implement Gulf of Mexico Fishery Management Council ("Council") Amendment 53 to the Fishery Management Plan for the Reef Fish Resources of the Gulf of Mexico ("Amendment 53"), JA-3293, AR 7946-8268, are more appropriately stated as:

1.     Whether the Rule complies with National Standard 4 under the Magnuson-Stevens Conservation and Management Act (the "Magnuson Act"), 16 U.S.C. § 1851(a)(4)(B), which requires allocations of fishing privileges to be "reasonably calculated to promote conservation," because it promotes conservation, correctly considering all parts of the Rule that affect distribution of fishing privileges; the Rule's quota-setting aspect addresses Plaintiffs' concerns regarding the percentage-allocation aspect; recreational fishing is included in "conservation" under the Magnuson Act; and the Magnuson Act requires protection of recreational fishing equally with commercial fishing.

2.     Whether the Rule complies with National Standard 9 under the Magnuson Act, 16 U.S.C. § 1851(a)(9), which requires conservation and management measures to "minimize bycatch" and the "mortality of such

bycatch," "to the extent practicable," because the Rule considered and accounted for increased bycatch attributable to its percentage-allocation aspect in its quota-setting aspect.

3.     Whether the Rule complies with 16 U.S.C. § 1853(a)(15), which requires fishery management plans to have "annual catch limits… at a level such that overfishing does not occur in the fishery, including measures to ensure accountability," because the Rule sets quotas to avoid overfishing, including with respect to bycatch, and preserves existing accountability measures.

4.     Whether the Rule is proper under 5 U.S.C. § 706(2)(A) regarding the Service's economic analysis because the analysis concluded that the selected allocation is expected to result in the greatest net economic benefits to the nation *out of the alternatives considered*, which is fully compatible with an earlier statement by the Service that *maximizing* net economic benefits is not possible; and the latter is unnecessary here.

## STATEMENT OF THE CASE

In 2009, the National Marine Fisheries Service (the "Service") promulgated a final rule at 74 Fed. Reg. 17603 (April 16, 2009) to implement Amendment 30B to the Gulf of Mexico Fishery Management Council's (the "Council") Fishery Management Plan for the Reef Fish Resources of the Gulf of Mexico ("Amendment 30B"). JA-2133, AR 10410-10871. In pertinent part, Amendment 30B allocated 76% of the total allowable red grouper catch to the commercial sector and 24% to the recreational sector.[1] JA-4485, AR 10482-10484. This allocation was based on the average recreational and commercial catch in 1986 through 2005. *Id*.

Recreational catch is estimated, not counted. For Amendment 30B, the recreational catch was estimated from effort data (data regarding how much recreational fishing activity occurred) collected through the then-current Marine Recreational Fisheries Statistics Survey. JA-4485, AR 10480. This survey used telephone surveys to collect the effort data. JA-3293, AR 7977.

In 2008, this survey was replaced by the Marine Recreational Information Program, which continued to use the Coastal Household Telephone Survey

---

[1] The recreational sector includes charter and headboat fishing, also referred to as "for-hire" fishing, as well as private angling. 16 U.S.C. § 1802(3). Both components are managed for red grouper under the recreational allocation. There are significant differences in fishing by and the management of the two components, but Plaintiffs' arguments specifically address the private angling component. Louisiana's argument herein therefore similarly addresses only the private angling component.

3

("CHTS") portion of the prior survey to collect the effort data.  *Id*.; JA-6392, AR 18888; JA-6519, AR 19471.  CHTS involved randomly calling land lines in coastal households to inquire as to their fishing activity.  JA-3293, AR 7977; JA-6519, AR 19471.

In 2018, the Service replaced CHTS with the Fishing Effort Survey ("FES") to collect the effort data.[2] JA-3293, AR 7977.  The Service now uses FES to measure ("monitor") recreational catch.  JA-3293, AR 7978.  FES is a mail survey that is targeted to licensed anglers, and is accepted as being better than CHTS. JA-3293, AR 7977-7978; JA-6203, AR 18690; JA-1925, AR 5395.  The Service ran CHTS and FES side-by-side for three years before making this transition, and developed a "calibration model" to convert data between the two.  JA-3293, AR 7977; JA-1925, AR 5395.  In general, estimates of the same fishing activity using FES are nearly three higher than those using CHTS, precisely because FES is better designed to measure fishing activity.  JA-3293, AR 7978; JA-1925, AR 5395-5396.

The calibration model converts catch estimated using FES to the catch that would have been estimated using CHTS, and vice versa.  JA-3293, AR 7978; JA-

---

[2]     Other improvements were made to the Marine Recreational Information Program in 2018, notably its Access Point Angler Intercept Survey portion, which collects data about the fish that were caught (how many fish and of what size).  JA-3293, AR 7977.  Plaintiffs' arguments relate to the effort component (CHTS and FES).  Louisiana's argument herein therefore similarly addresses only the effort component.

1925, AR 5395-5396.  In other words, if the catch for a given year is estimated using FES to be one million pounds, the calibration model calculates what the estimate of that same catch would be using CHTS, and vice versa.  Calibration is necessary for historic effort estimates generated using CHTS to be compared to new estimates generated using FES.  *Id*.

For this reason, the Council's Science and Statistical Committee (the "Science Committee") voted unanimously to require catch monitoring to be "consistent with the recreational landings time series used in the stock assessment and reviewed by the [Science Committee] to generate the [overall quotas] for each stock."  JA-6519, AR 19480.  Without calibration, CHTS and FES data are not comparable and so cannot be used to provide the continuous time series of catch needed for fishery management.  JA-6392, AR 18886.  Catch estimated using a given survey is often said to be stated in "units" of that survey.  *E.g*., the 1-million-pound FES estimate is said to be "1 million pounds in FES units," while its CHTS equivalent is said to be "X pounds in CHTS units," where X is the corresponding number as determined by the calibration model.

The Magnuson-Stevens Conservation and Management Act (the "Magnuson Act") *requires* use of the "best scientific information available."  16 U.S.C. § 1801(c)(3).  The CHTS/FES calibration model was peer-reviewed in 2017, JA-6203, AR 18688-18702, and reviewed by the Science Committee in 2020.  JA-3293, AR

7978; JA-3293, AR 5179-5180.  The Service's Southeast Fisheries Science Center determined that catch data in or calibrated to FES ("FES-adjusted data") are the best scientific information available regarding recreational landings for updating red grouper sector allocations.  JA-3293, AR 7978.

The latest red grouper stock assessment, Southeast Data, Assessment and Review 61 (the "Assessment") (JA-1925, AR 5344-5628), was completed in 2019.  JA-3293, AR 7978.  It used the FES data to estimate the overall stock.  JA-5275, AR 12275, 12277; JA-1925, AR 5493, 5395-5396.  The Assessment used catch estimates to determine stock size, and so the increased estimated recreational catch due to using the FES-adjusted data led to an increase in the stock size estimate as well, compared to what it would have been using the uncalibrated CHTS data instead.  *Id*.; JA-3293, AR 7978.

The Science Committee concluded that the Assessment – including its use of the FES-adjusted data – represent the best scientific information available.  JA-3293, AR 7979; JA-4456, AR 9686; JA-1917, AR 5179-5180.  The Science Committee recommended a significant reduction of the Overfishing Limit and Acceptable Biological Catch, the overarching limits on how many fish can be caught by all sectors, because the stock biomass was below the target level (though neither overfished nor undergoing underfishing) due in significant part to a massive fish kill due to an algae bloom in 2018.  JA-3293, AR 7978-7979; JA-1917, AR 5179.  The

Science Committee also recommended allocation of the total quota 59.3% to the commercial sector and 40.7% to the recreational sector if using the same years of catch data as Amendment 30B, updated from CHTS units to FES units. JA-3293, AR 7980; JA-1917, AR 5179. Slightly different allocations were recommended, if using catch data from other years. *Id*.

In Amendment 53, the Council considered alternatives of no change,[3] retaining the existing sector allocations (Alternative 2, which Plaintiffs seek here), basing the allocations on the same years of catch data used in Amendment 30B (Alternative 3, the one selected), Alterna, basing the allocations on different years of catch data, and basing the allocations on preserving the existing quota to the commercial sector. JA-3293, AR 7987-7995. The Council chose to base the allocations on the catch from the same years used for Amendment 30B, adjusted from CHTS units to FES units. JA-3293, AR 7995. The Council reasoned that this would use the best scientific information available (FES) and "would best represent the historical landings used in [Amendment 30B] while accounting for [FES] data."

---

[3]  The "no change" alternative was impermissible because at a minimum, the Overfishing Limit and Acceptable Biological Catch had to be reduced due to the Science Committee's recommendation. This is because the Council is bound by the Science Committee's recommendations regarding the Overfishing Limit and Acceptable Biological Catch. 16 U.S.C. § 1852(h)(6). "No change" was also impermissible because by ignoring the FES calibrations, this alternative would violate the Magnuson Act's requirement to base management actions on the best scientific information available, which is FES. 16 U.S.C. § 1801(c)(3). JA-3293, AR 7989.

JA-3293, 7990, 7995.  The Council further reasoned that this would result in similar reductions to both sector quotas due to the reduced Overfishing Limit and Acceptable Biological Catch, whereas other allocations would result in the recreational sector bearing a far greater share.  JA-3293, 7995.  Also, other allocations would not accurately reflect the historical participation of the recreational and commercial sectors in the industry, and would cause disproportionate adverse effects to the recreational sector.  *Id*.  Finally, the preferred alternative would result in the greatest net economic benefits to the Nation.  *Id*.

The Service implemented Amendment 53 by promulgating the Final Rule, 87 Fed. Reg. 25573 (May 2, 2022) (the "Rule").  JA-5814, AR 17419-17436.  The Rule is referred to as a "reallocation" because it changes the stated percentages of the total quota allocated to each sector.  But in actuality it is merely a conversion of the *quota* to measure and state it in the same FES units in which the *stock* and *catch* are now measured and stated.  If this "reallocation" were not made, then the increase to the stock size due to the conversion to FES, even though that increase is attributable to the recreational sector, would go 76% to the commercial sector.

Also, the recreational quota would be consumed *much* more quickly due to the conversion to FES, even though the conversion is only a change in the way the recreational catch is estimated – the *actual* recreational catch did not change, it is merely estimated differently.  Since recreational fishing is managed in pertinent part

8

by closing the season when the quota is projected to be reached, consuming the quota more quickly results in shorter seasons. The season was projected to close on December 19 under the Rule, whereas the alternative promoted by Defendants, Alternative 2 considered under Amendment 53, would have resulted in closure on August 8. JA-3293, AR 7993-7994, 8070. Thus, failing to implement the allocation selected in Amendment 53 (Alternative 3) would have been a *true* reallocation to the commercial sector and would have substantially reduced recreational access to the red grouper (more than a four-month reduction in the annual season length).

The Service pointed this out in the Rule. JA-5814, AR 17429 ("because [the Assessment] incorporates the new [FES] recreational landings estimates and the revised recreational catch limits will be in [FES] units, maintaining the current allocation of 76 percent commercial and 24 percent recreational would result in a reallocation to the commercial sector."). Nevertheless, Plaintiffs filed the present suit seeking the courts to order the Service to do exactly what the Council and the Service chose not to do: ignore the conversion of the stock and catch reporting data to FES, and instead affirmatively reallocate red grouper quota from the recreational sector to the commercial sector.

The District Court rejected Plaintiffs' myriad arguments, the majority of which Plaintiffs have abandoned on appeal. In a comprehensive and exhaustively reasoned opinion, the District Court denied Plaintiffs' Motion for Summary

Judgment and granted Defendants' Cross-Motion for Summary Judgment and
Intervenor-Defendants' Cross-Motions for Summary Judgment. *A.P. Bell Fish Co.,
Inc. v. Raimondo,* Civil Action No. 1:22-cv-1260-TJK, 2023 WL 122270 (D.D.C.
Jan. 6, 2023); JA-0258, ECF 45; JA-0259, ECF 46.

## SUMMARY OF THE ARGUMENT

Plaintiffs' overall approach is to cherry-pick particular parts of the Magnuson Act and the Rule, and ignore the rest. This selective approach is improperly narrow. Other parts of the Act preclude the myopic focus Plaintiffs urge the Court to take, and other parts of the Rule address Plaintiffs' concerns. The District Court correctly rejected Plaintiffs' reductionist approach.

National Standard 4 under the Magnuson Act requires allocations of fishing privileges to be "reasonably calculated to promote conservation." Plaintiffs argue that the Rule fails to satisfy National Standard 4 on the theory that its "allocative aspect" (the allocation percentages) does not "promote conservation" because it increases bycatch and management uncertainty and reduces fecundity (ability to produce offspring).

However, "allocation" means any part of a rule that directly results in distribution of fishing privileges. This includes not only the percentage-allocation aspect of the Rule, but also the parts of the Rule that adjusted the overall quotas, as these quota-setting aspects of the Rule obviously affect distribution of the fishing privileges too (as Plaintiffs also and contradictorily complained below).

The Magnuson Act includes assuring that recreational benefits may be obtained on a continuing basis in its definition of "conservation and management." This definition applies to the term "conservation" as addressed in National Standard

4, which cannot reasonably be unrelated. This is also consistent with the repeated emphasis throughout the Magnuson Act on preserving recreational fishing as a fundamental aspect and goal. It is also consistent with the common meaning of "conservation" as including use of natural resources in a way that ensures the highest social and economic benefits. Thus, conservation does not pertain solely to the biological analysis that Plaintiffs claim. Rather, recreational fishing is *part* of conservation, not something opposed to or apart from it.

And in any event, the quota-setting aspects of the Rule addressed Plaintiffs' biological concerns, because the quotas were set to account for increased dead discards and reduced fecundity resulting from the percentage allocations. And there is no difference between the Rule and Plaintiffs' preferred reallocation to the commercial sector as far as management uncertainty, as the Science Committee concluded that both posed the same statistical risk of overfishing.

The Rule "continues" the recreational benefits to the same extent as under the pre-Rule allocations, not least because the Rule merely reset the allocations based on the new FES estimates, which are nothing more than a conversion (calibration) of the estimates from the old CHTS system into the new FES system. The same actual historical fishing activity happened; the new system merely estimates that activity at a higher rate than the old one did. But the stock assessments *are* higher than they otherwise would have been because they used the new FES and FES-

calibrated estimates; and the catch reporting *will* be much higher because it will use the FES estimates.

FES is the new best available scientific information, and the Rule recalculated the allocations using it, not only to update to the new best available scientific information as required by the Magnuson Act, but also to coordinate the quotas with the system being used to measure catch against that quota. This is necessary to be "fair and equitable" to the recreational sector, as Magnuson *also* requires in National Standard 4. By contrast, failing to do so would be a large *de facto* reallocation to the commercial sector, as the Service and the District Court recognized. Plaintiffs fail to justify this by claiming that it would further "conservation," when such an inequitable reallocation is incompatible with the Magnuson Act's recognition of recreational fishing as part of conservation.

Finally, Plaintiffs' argument simply proves too much. The things about which they complain are part and parcel of recreational fishing: increased bycatch, because recreational fishing inherently involves catching fish that must be released due to bag limits, size limits, seasonal closures, the catch-and-release aspect of recreational fishing, and other reasons; reduced fecundity, because recreational fishermen catch younger fish; and increased management uncertainty, because recreational catch is estimated instead of counted. Attacking recreational fishing for these reasons is attacking it for *being* recreational fishing. Such an existential attack on recreational

fishing is impermissible under the Magnuson Act due to the Act's repeated emphasis on the importance of and requirement to treat recreational fishing equally and fairly with commercial fishing.  The fact that Plaintiffs' argument has no limit short of precluding any allocation to the recreational sector demonstrates its impropriety.

National Standard 9 under the Magnuson Act requires conservation and management measures to "minimize bycatch" and the "mortality of such bycatch," "to the extent practicable."  Plaintiffs argue that the Rule fails to satisfy National Standard 9 because it increases bycatch.

However, this is false because the effective quota was adjusted to account for bycatch.  Plaintiffs' arguments that the Service failed to "consider" bycatch or to do so "enough" are wrong because there are entire sections in the record where the Service or the Council did exactly that.  Again, bycatch was addressed in the Rule.

Finally, Plaintiffs complain that the Service merely acknowledged bycatch without doing something about it - ignoring, once again, that there are *already* management measures in place to address it.  Plaintiffs are *really* arguing for a fundamental change in the management of the recreational sector, to impose the massive apparatus applicable to commercial fishing.  This is unreasonable, given the vast differences between recreational fishing, by definition an activity in which many thousands engage for sport or pleasure, and commercial fishing, which is a for-profit industry in which only a few hundred engage.  To the contrary, the

14

Magnuson Act expressly recognizes that the sectors are different and can and should be managed differently, as appropriate to each. This precludes Plaintiffs' attempt to seek the Court to ignore the law as written to require equality of the sectors, and to recast it as favoring only the commercial sector.

16 U.S.C. § 1853(a)(15) requires fishery management plans (including the Rule) to "establish a mechanism for specifying annual catch limits … at a level such that overfishing does not occur in the fishery, including measures to ensure accountability." Plaintiffs argue that the Rule fails to satisfy this requirement because it does not address dead discards and lacks accountability measures.

However, the Rule sets quotas to avoid overfishing, including with respect to bycatch, and preserves existing accountability measures. The quotas account for bycatch and all other sources of mortality, because the Assessment on which they are based already factors it in. The Service's regulations allow this. Plaintiffs are not entitled to a separate "line item" under the Rule specifically for "dead discards," tracked directly as such. Nor are Plaintiffs entitled to imposition of some requirement to track discards fish-by-fish; unlike commercial fishing, recreational fishing is and must be estimated. This fact cannot be enough to invalidate allocation of fishing privileges to the recreational sector because it is a fundamental aspect of recreational fishing, which is protected by the Magnuson Act.

15

Plaintiffs argue that the Service was inconsistent in its economic analysis for the Rule by concluding that the selected allocation is expected to result in the greatest net economic benefits to the Nation, versus an earlier statement by the Service that maximizing net economic benefits is not possible. However, the former merely means that *out of the alternatives considered*, which includes the reallocation to the commercial sector that Plaintiffs seek, the one chosen in the Rule results in the greatest net economic benefits to the nation. The Rule *does not* say that this allocation *maximizes* net economic benefits, which cannot be done. There is no conflict here; both are true. Only the former matters; nothing required determining the absolute maximum possible benefit, but it was relevant and supports the Rule, that of the alternatives considered, the one selected conveys the most benefit.

Finally, maximizing economic benefit was not the purpose for the Rule. Optimizing yield was; and using the best scientific information available (FES), as the Service has done, was paramount in that endeavor.

## ARGUMENT

Plaintiffs' overall approach is to cherry-pick particular words from the complex Magnuson Act and ignore the rest; and similarly, to cherry-pick particular aspects of the Rule and ignore the rest. This selective approach is improper; as Plaintiffs themselves quote, "reasonable statutory interpretation of [a provision of the Magnuson Act] must account for the broader context of the statute as a whole." Appellant Brief at 28, quoting *Wisconsin v. Envtl. Prot. Agency*, 938 F.3d 303, 316 (D.C. Cir. 2019), in turn quoting *Util. Air Regulatory Grp. v. E.P.A.*, 573 U.S. 302, 321 (2014)).

Plaintiffs read their chosen selections from the Magnuson Act and the Rule too narrowly. Their arguments bring to mind the three blind men each touching an elephant's flank, leg, and ear and respectively pronouncing that an elephant is like a wall, a tree trunk, and a fan. They all miss the point by examining an inappropriately small portion of the thing to be analyzed, and Plaintiffs do the same. This fallacy underlies much of their argument. The District Court correctly rejected Plaintiffs' reductionist approach.

## I.    The Rule satisfies National Standard 4 because it promotes conservation, correctly considering all parts of the Rule that affect distribution of fishing privileges and all requirements of the Magnuson Act.

Plaintiffs argue that the Rule fails to satisfy National Standard 4 because its "allocative aspect" – by which they mean the allocation percentages – does not

"promote conservation" because it increases bycatch[4] and management uncertainty and reduces fecundity (ability to produce offspring). However, the Rule, not just part of it, is the relevant frame of reference. The Rule *does* promote conservation, not only because other parts of the Rule address bycatch, uncertainty, and fecundity, but also because the Rule prevents massive impairment of recreational fishing, which is *part* of "conservation." Plaintiffs' argument both improperly narrows the portion of the Rule to be analyzed and misinterprets the term "conservation."

A.    **Compliance with National Standard 4 is determined by reference to all aspects of the Rule that directly affect distribution of fishing privileges, including the quota-setting aspect that addresses Plaintiffs' concerns regarding the percentage-allocation aspect.**

Plaintiffs ignore that the Rule is one rule with interdependent parts that work together. Viewing the percentage allocations in isolation, and ignoring the rest of the Rule that also affected distribution of fishing privileges by addressing the ill effects of the percentage allocations, impermissibly avoids reviewing the "broader context" of the Rule in favor of a crabbed view of only a portion of what it does.

As the District Court pointed out, "allocation" means any part of a rule that directly results in distribution of fishing privileges. JA-0259, ECF 46 at 23-24, citing 50 CFR 600.325(c)(1) and several cases. The analysis under National Standard 4

---

[4]    "Bycatch" means "fish which are harvested in a fishery, but which are not sold or kept for personal use, and includes economic discards and regulatory discards. Such term does not include fish released alive under a recreational catch and release fishery management program." 16 U.S.C. § 1802(2).

whether the Rule is "reasonably calculated to promote conservation" must therefore address *everything* in the Rule that affects distribution of fishing privileges because *the allocation is all of that*.  This includes the parts of the Rule that adjusted the overall quotas specifically to account for the increased bycatch and management uncertainty and reduced fecundity of which Plaintiffs complain (addressed in the next section).  These aspects of the Rule obviously affect distribution of the fishing privileges – as Plaintiffs themselves complained in their now-abandoned argument that the reduction of the total quota to account for these matters is a "double penalty" to commercial fishermen.  JA-0137, ECF 30 at 33-34.

It makes no sense to argue that ill effects under one part of a rule invalidate the rule, when those ill effects are remedied elsewhere in the same rule.  Nothing requires such a myopic view, and it is incompatible with the interests of justice (and common sense) to assess a rule without considering *all* of it.  Plaintiffs' attempted resort to statutory language to require this is unavailing, because National Standard 4 applies to an "allocation" and the other aspects of the Rule are part of the same "allocation" as the percentages.

Plaintiffs argue that interpreting "allocation" in National Standard 4 to include the portions of the Rule that address the problems Plaintiffs claim – increased bycatch, reduced fecundity, and increased management uncertainty – conflicts with other parts of the Magnuson Act that require prevention of overfishing, achieving

optimum yield, minimizing bycatch, and protecting the health and stability of the fishery. This is illogical. The Rule remedies ill effects of the percentage allocations under other provisions of the Magnuson Act as well, or there are no such ill effects (the only relevant provisions are addressed below, since Plaintiffs' appeal is limited to these). Regardless, nothing about the existence of other requirements precludes the courts from considering the entirety of the allocation made by the Rule, much less makes it appropriate to limit consideration to only one aspect of the allocation.

The "allocation" at issue here is not limited to the percentages set in the Rule, but includes the other portions of the Rule as well. As the District Court had no difficulty recognizing, the entirety of the Rule that affects distribution of fishing privileges is the proper frame of reference for whether the Rule "promotes conservation."

**B.     The Rule promotes conservation as required by National Standard 4 because it addresses Plaintiffs' concerns regarding the percentage-allocation aspect, and because it prevents massive impairment of recreational fishing, which is part of conservation.**

As the District Court noted, "conservation" *as such* is undefined in the Magnuson Act. However, "conservation and management" *is* defined, and it is difficult to see how the two could possibly be unrelated. Under 16 U.S.C. § 1802(5),

> the term "conservation and maintenance" refers to all of the . . . measures (A) . . . useful in rebuilding, restoring, or maintaining, any fishery resource . . . ; and (B) which are designed to assure that --

> (i)     a supply of food and other products may be taken, and that recreational benefits may be obtained, on a continuing basis;
>
> (ii)    irreversible or long-term adverse effects on fishery resources and the marine environment are avoided; and
>
> (iii)   there will be a multiplicity of options available with respect to future uses of these resources.

There is no basis to distinguish what part of this is "management" and what part is "conservation." Nor is there any good reason to parse the language this way – the entire definition applies to conservation because the relevant management logically is *for* conservation.

In particular, the reference in 16 U.S.C. § 1802(5) to "assur[ing] … that recreational benefits may be obtained, on a continuing basis" is consistent with the emphasis throughout the Magnuson Act on preserving recreational fishing as a fundamental aspect and goal. The Magnuson Act not only recognizes recreational fishing as permissible, but expressly preserves the right to fish recreationally. 16 U.S.C. § 1803(B). It defines the "optimum" yield from a fishery as that which "will provide the greatest overall benefit to the Nation, particularly with respect to food production and recreational opportunities." 16 U.S.C. § 1802(33). The Magnuson Act also cites the importance of recreational fishing to the Nation and that it must be managed differently than commercial fishing: "[w]hile both provide significant cultural and economic benefits to the Nation, recreational fishing and commercial

fishing are different activities. Therefore, science-based conservation and management approaches should be adapted to the characteristics of each sector." 16 U.S.C. § 1801(a)(13). The conclusion is not only reasonable, but inescapable, that the Magnuson Act's reference to "conservation" in National Standard 4 includes recreational benefits as well as biological attributes.

Even if the Magnuson Act's definition of "conservation and management" were somehow irrelevant, BLACK'S LAW DICTIONARY defines conservation, for purposes of environmental law, as "The supervision, management, and maintenance of natural resources such as animals, plans, forests, etc., to prevent them from being spoiled or destroyed; the protection, improvement, and use of natural resources in a way that ensures the highest social as well as economic benefits." *Id*. at 370 (10th ed.). This corresponds to the statutory definition of "conservation and management" under the Magnuson Act, including its reference to recreational benefits, recast as "social" or "economic" benefits.

As the District Court also recognized, this Court has noted that the ordinary meaning of "conservation" includes preventing damage to a natural resource. *See Copper Valley Mach. Works, Inc. v. Andrus*, 653 F.2d 295, 601 & n.7 (1981) ("Preventing [damage to the permafrost character of an oil lease area through drilling] is obviously in the interest of conservation if that term is to receive its ordinary meaning."). This covers the biological aspect of the Magnuson Act

definition of "conservation and management," but hardly precludes consideration of the recreational benefits aspect as well – nor could it, given the Magnuson Act's repeated emphasis on recreational fishing.

Converting CHTS-based allocations to FES, and avoiding the reallocation to the commercial sector that would result from ignoring the conversion to FES, ensures that recreational benefits are obtained on a continuing basis, and thus falls squarely within the Magnuson Act's conception of "conservation." JA-5814, AR 17429 ("maintaining the current allocation of 76 percent commercial and 24 percent recreational would result in a reallocation to the commercial sector."). Plaintiffs are mistaken in attempting to construe the "conservation" that must be "promoted" by an allocation as being limited to the "biological benefits" they claim.

And while recreational fishing does increase dead discards (because recreational fishing inherently involves catching fish that must be released due to bag limits, size limits, seasonal closures, the catch-and-release aspect of recreational fishing, and other reasons), change the age structure (because recreational fishermen catch younger fish), and increase management uncertainty (because recreational catch is estimated instead of counted), *these are all accounted for in the overall quota*. JA-4456, AR 9686 ("The [Science Committee] also determined that all of the alternative catch levels [which included the pre-existing allocation] projections were acceptable"). It is incorrect to argue that the Rule is invalid because of these

issues, when the Rule set the overall quota (of which the sector allocations are percentages) to take them into account.   It is also incorrect to argue that there is a greater risk of overfishing, when the allocations being evaluated (including the one Plaintiffs want, vacatur of the Rule, *i.e.*, Alternative 2 under Amendment 53) all pose the same statistical risk of overfishing.   JA-4465, AR 9686.

The Rule literally "continues" the recreational benefits to the same extent as under Amendment 30B, the status quo prior to the Rule.   It therefore "promotes" recreational benefits on a continuing basis and thus promotes conservation as required by National Standard 4.   It further promotes conservation by replacing the basis for the allocation with the new, "better" scientific information embodied in the FES-adjusted catch data that is now available, in fulfillment of the Magnuson Act's requirement to use the best scientific information available.   16 U.S.C. § 1801(c)(3).   And in any event, the biological benefits and impacts of the Rule are actually equal to those of Plaintiffs' chosen reallocation, as embodied in the reduction of the overall quota to account for the ill effects on the resource about which Plaintiffs complain.

The District Court found that "[o]n its face," the Rule seems reasonably calculated to promote conservation because it reduces the quota to a level that the Science Committee determined would preserve the stock so that its benefits will be available "on a continuing basis."   JA-0259, ECF 46 at 22.   Plaintiffs have provided no reason to think that the committee erred.   Rather, Plaintiffs argue that 16 U.S.C.

24

§ 1853(a)(15) already requires setting catch limits at a level such that overfishing does not occur, so National Standard 4's requirement to "promote conservation" must mean something else. Again, this is illogical. A single action can satisfy more than one requirement. The existence of two requirements does not require two actions; rather, a single action may satisfy both. The Rule *does* satisfy both: as the District Court held, the total catch limit accounted for bycatch, effects of the average age on the stock, and management uncertainty. JA-0259, ECF 46 at 27. It did this by reducing the quotas that would have been set according to the straight percentage allocations to account for these things. The fact that this satisfies § 1853(a)(15)'s requirement to avoid overfishing hardly means that it does not *also* satisfy National Standard 4's requirement to promote conservation. To the contrary, this fact suggests that both are met because avoiding overfishing (greater harvest than that allowing the benefits to be available on a continuing basis) prevents damage to the resource. And regardless, it is not the mere fact that the overfishing limit is preserved that itself satisfies National Standard 4, as Plaintiffs claim, but that the Rule promotes conservation, as addressed above.

Plaintiffs simply ignore the fact that the harms of which they complain have been addressed in the quota-setting aspects of the Rule. Their repeated accusations that the Rule is "unwise," etc. due to these harms are a straw-man argument that should be ignored.

Plaintiffs argue that the Magnuson Act requires the Service to "give priority to conservation measures" over "consideration [of] adverse economic consequences," citing *Nat. Res. Def. Council v. Daley*, 209 F.3d 747, 753 (D.C. Cir. 2000). This argument is irrelevant, because Plaintiffs wrongly relegate recreational fishing as mere "economic consequences," when in fact *recreational fishing is part of conservation* under the Magnuson Act. Quite the opposite of Plaintiffs' argument that recreational fishing must be subordinate to biological considerations (and by implication, subordinate to commercial fishing), the Magnuson Act expressly *preserves* recreational fishing. Plaintiffs' argument cannot be credited without violating the Magnuson Act's express preclusion (even in the very same National Standard 4) of allocations that are not "fair and equitable to all fishermen" (much less the other Magnuson Act provisions cited above) because it treats recreational fishermen as second-class citizens when it comes to allocation of fishing privileges. 16 U.S.C. § 1851(a)(4). This is impermissible under the Magnuson Act.

And this points out another fundamental flaw underlying Plaintiffs' argument – it proves too much. As the District Court pointed out, Plaintiffs' argument "equates to saying that any increase in the allocation to the recreational sector is unfair." JA-0259, ECF 46 at 25-26. While Plaintiffs have abandoned their "fair and equitable" argument, they still argue that the Rule's percentage allocation to the recreational sector was improper because it will increase bycatch, reduce fecundity,

and increase management uncertainty. But this argument applies to *any* allocation *at all* to the recreational sector, and so goes too far.

Releasing the fish is a fundamental part of recreational fishing, which is done for the pleasure of catching the fish, not just to retain them. This is fundamentally different from commercial fishing, the sole purpose of which is to catch *and retain* the fish. JA-5814, AR 17423. "Recreational fishing" is statutorily defined in the Magnuson Act as "fishing for sport or pleasure." 16 U.S.C. § 1802(37). Consequently, catching more fish than can ultimately be harvested, necessitating that the excess fish be released, is part and parcel of recreational fishing.[5] The same goes for reduced fecundity, a result of the fact that recreational fishermen catch smaller fish than commercial fishermen – it is part and parcel of recreational fishing.

And management uncertainty accompanying recreational fishing is due to the necessity to estimate recreational catch – once again this is due to the nature of recreational fishing. Plaintiffs are commercial fishermen, who number in the hundreds, JA-0062, ECF 20, p. 6; and who hail from relatively few discrete locations and must necessarily return to dealers to sell the fish they have caught. Moreover,

---

[5]    Fish are much more likely to survive being released by recreational fishermen than by commercial fishermen – discard *mortality* is 11.6% for the recreational sector and 19% to 41.5% for the commercial sector (depending on the fishing mode used). JA-5275, AR 12276. *Total* discard mortality is greater for the recreational sector only because recreational fishermen release many more of the fish they catch than do commercial fishermen.

they are by definition commercial operations, which have the resources to comply with the onerous requirements imposed on the commercial fishery. It is practical and reasonable to impose requirements for monitoring, reporting, etc. on this "closely regulated industry" involving a small number of fishermen, requiring them to directly report their catch. *See Mexican Gulf Fishing Co. v. U.S. Dep't of Commerce*, 587 F.Supp.3d 428, 483 (E.D. La. 2/28/2022), reversed on other grounds applicable to for-hire recreational fishing, 60 F.4th 956 (5th Cir. 2023). By contrast, there are enormously more recreational fishermen, numbering in the thousands if not tens of thousands, and they hail from a similarly large number of discrete locations, including their personal homes and camps. And fishing is not their business; it is by definition recreation for them. It is not practical or reasonable to require all of these individuals to submit to the same requirements as the commercial fishing industry. That is why nearly every agency that manages recreational fishing *estimates* recreational harvest. To preclude allocation to the recreational sector due to the impracticality of foisting the burdens of the commercial fishing sector onto the recreational sector is to penalize the recreational sector for its very nature. This would violate the Magnuson Act's *protection* of the recreational sector, and that the sectors can and should be managed appropriately to the circumstances of each.

The fact that Plaintiffs' argument has no limit short of precluding any allocation to the recreational sector (and for *every* species governed by the

Magnuson Act, not just the red grouper at issue here) demonstrates its impropriety. The Magnuson Act defines "recreational benefits" as part of the required analysis, forestalling Plaintiffs' argument that recreational fishing is not entitled to allocation on the theory that it is inherently wasteful.

## II.     The Rule satisfies National Standard 9 because the Service considered and accounted for increased bycatch pursuant to its percentage-allocation aspect.

Plaintiffs argue that the Rule violates National Standard 9 because it increases bycatch. This is simply false, as the District Court had no trouble recognizing, because "the effective quota was adjusted to account for the allocation to the recreational sector [in the percentage-allocation aspect of the Rule]." JA-0259, ECF 46 at 29, citing JA-3293, AR 8082.

So Plaintiffs argue that the Service failed to "consider" bycatch. This, too, is false, not least as demonstrated by the Service's consideration of bycatch that the District Court cited in concluding that the Rule is not estimated to increase bycatch. JA-0259, ECF 46 at 29, citing JA-3293, AR 8082. Indeed, there is a lengthy section in Amendment 53 for "Bycatch Practicability Analysis." JA-3293, AR 8168-8190; 8187. As the District Court further noted, bycatch is higher than it would be for a plan with the same overall quota and a higher allocation to the commercial sector, "but such a plan is not the relevant benchmark." JA-0259, ECF 46 at 29. That is

because the "effective [meaning, actual] quota was adjusted to account for the allocation" under the Rule. *Id.*

So again, Plaintiffs move on to argue that NFMS failed to consider bycatch *enough*. But as even Plaintiffs admit, the requirements of National Standard 9 are limited "to the extent practicable." Appellant Brief, p. 33; 16 U.S.C. § 1851(a)(9). They also admit that a "reasoned analysis of the bycatch issue" is all that is required. Appellant Brief, p. 33; *Flaherty v. Bryson*, 850 F.Supp. 38, 59 (D.D.C. 2012) (noting that language of the amendment to the fishery management plan at issue there "makes it clear that neither the Council nor the Service made any effort to consider whether bycatch was minimized" and did "not reflect any examination or consideration" of whether the Amendment reduced bycatch). That is hardly the case here, where the Service considered bycatch – and that it might actually *decrease*. JA-3293, "Bycatch Practicability Analysis," AR 8168-8190; 8187. In addition, the Service has to consider economic, social, and cultural factors in determining consistency with National Standard 9 – and did so. JA-0859, AR 1724-25, 8168, 8181-88; 50 CFR § 600.350(d)(3). Again, this argument is incorrect.

Plaintiffs claim that the Service merely "acknowledged" bycatch without doing something to minimize it. However, the Service considered that there are *already* measures in place to minimize bycatch, which would continue to apply, such as gear restrictions and requirements, season and area closures, size restrictions, and

bag limits. JA-5814, AR 17419, 8176-80. In reality, Plaintiffs are arguing for some fundamental change to recreational fishing and that by not taking this on, or taking some new action about bycatch reduction that suits Plaintiffs' desires, the Service cannot change the allocations. This is obviously not the case – particularly when the "reallocation" at issue is merely to preserve the status quo as the catch estimation system changes. Once again, Plaintiffs isolate a particular passage from the entirety of the Magnuson Act and ignore the rest. Recreational fishing is permissible, it involves and has always involved bycatch, and the Rule merely addresses the change in the best scientific information available. That is all the Service had to do under the Magnuson Act.

Further, Plaintiffs fail to explain how the Service could have avoided bycatch to any greater "extent," given the Rule's purpose of re-calculating allocations based on FES, the new best scientific information available. If the Service gave more allocation to the commercial sector, as Plaintiffs urge, that would not have met the purpose and would obviously have been unfair to the recreational sector – the recreational season would have been shortened by four months, even though there was no change to recreational fishing behavior or actual recreational catch. JA-3293, AR 7993-7994, 8070. The Service has to regulate for the benefit of both sectors, and not only should not, but cannot, regulate for the sole benefit of the commercial sector. Plaintiffs attempt to wrap themselves in the cloak of environmentalism,

claiming that they uniquely promote the health of the red grouper fishery, but the reality is that the Magnuson Act recognizes and protects the right to recreational fishing within the confines of the optimum yield and thus the Overfishing Limit – which the Science Committee established that the Rule does.  JA-1917, AR 5179-5180.

Plaintiffs even argue that recreational fishing is inherently wasteful and thus not entitled to allocation, and that allocation to the recreational sector "irrationally penalized the commercial sector and consumers."  Appellant Brief at 36.  Nobody is being "penalized," much less "irrationally."  The Magnuson Act preserves recreational fishing and guarantees the recreational sector its fair share of fishing privileges, and the Service has merely provided that fair share – the same share as in Amendment 30B, only in FES units instead of CHTS – after due consideration of the competing interests and standards.  Again the overreach, and thus the error, of Plaintiffs' argument is apparent from the fact that it literally applies to *any* recreational fishing.  The Magnuson Act precludes such an existential attack on the recreational sector.

## III.    The Rule satisfies 16 U.S.C. § 1853(a)(15) because it sets quotas to avoid overfishing, including regarding discards.

Plaintiffs argue that the effective quotas under the Rule violated 16 U.S.C. § 1853(a)(15) because the Rule does not address dead discards and lacks accountability measures.  Plaintiffs' argument boils down to the fact that there is not

a separate "line item" under the Rule specifically for "dead discards," tracked directly as such.

There is no requirement for the Service to address dead discards in the manner Plaintiffs choose. Rather, the requirement is merely to "establish a mechanism for specifying annual catch limits … at a level such that overfishing does not occur in the fishery, including measures to ensure accountability." *Id*. Here, the District Court recognized that "The recreational quota is expressed in landings, and that number accounts for other sources of fishing mortality via estimations that originate with the latest stock assessment." JA-0259, ECF 46 at 32; JA-5814, AR 17422. The quotas account for bycatch and all other sources of mortality, because the Assessment factors it in. JA-0259, ECF 46 at 32 n.10; JA-2679, AR 7357, 17422. In other words, bycatch is not estimated or tracked directly because it was already factored into the quotas. The Service's regulations allow this. 50 CFR § 600.310(f)(3)(i). Plaintiffs are not entitled to require the Service to ignore its regulations and the fact that bycatch is already taken into account in the quotas, to track it separately. Nor is it necessary or appropriate to do so, for the same reason and because both the requirements for the Service to monitor the recreational catch and the accountability measures to prevent overfishing remain in place. JA-5814, AR 17419.

33

Despite the District Court explaining exactly why *Oceana, Inc. Locke*, 831 F.Supp. 2d 95, 110 (D.D.C. 2011) is inapposite, Plaintiffs continue to rely on it as containing some admission by the Service that bycatch must be tracked as a separate line item.  That case involved a requirement under the quota system at issue to "measure discards in near real time."  JA-0259, ECF 46 at p. 31; *Oceana*, 831 F.Supp.2d at 109.  *There is no such requirement here*.  Neither *Oceana* nor any statement in it from which the Service is supposedly "backtracking" matters here.

Plaintiffs argue that there is new information available regarding the proportion of caught fish that recreational anglers discard. But the Service factored its new assessment of the dead-discard rate into the Rule by adjusting the catch limits. Its analysis of that information is woven throughout the Rule. See, e.g., JA-3293, AR 7961, 7969, 7978, 7988, 8016.

Plaintiffs next attack the District Court's reliance on its assumption that "So long as estimates of total fishing mortality are consistent, [the procedure under the Rule] will ensure the recreational sector stays beneath the total fishing mortality" as "assum[ing] away the problem Congress enacted Section 1853(a)(15) to address." According to Plaintiffs, the Service has to track dead discards annually to determine whether more or fewer discards occurred than projected.  But Plaintiffs ignore the Rule's solution to this; the absence of tracking is a problem according to Plaintiffs because it increases the risk of overfishing, but in addition to accounting for bycatch

34

in the quotas, JA-3293, AR 8187, the recreational buffer was increased (and thus the recreational quota decreased), which addresses increased uncertainty.  JA-3293, AR 7996-8001.

Yet again, Plaintiffs' *real* complaint is simply that individual recreational fishermen are not reporting their discards individually, fish by fish, as commercial fishermen are required to do.  They even apparently advocate having monitors on board recreational fishing boats, similar to commercial fishermen, reprising their resort to the irrelevant *Oceana* case.  Appellant Brief, at p. 44.  This is not reasonable. The reality is that recreational fishing is and must be estimated.  Even the quotas themselves are based on estimates from the stock assessments. The fish in the sea are not counted; nor is the recreational catch.  This cannot be enough to invalidate allocation of fishing privileges to the recreational sector because it is a fundamental aspect of recreational fishing, which is protected by the Magnuson Act.

**IV.  The Rule concluded that the allocation in that rule is expected to result in the greatest net economic benefits to the nation *out of the alternatives considered*, which is entirely compatible with an earlier statement that *maximizing* net economic benefits is not possible.**

Contrary to Plaintiffs' argument, there is no inconsistency between the Service's statement in the Rule that the selected allocation is expected to result in the greatest net economic benefits to the nation; and statements in the earlier Fishery Management Plan Amendment 28 that changes in net benefits estimates are

erroneous where a sector's quota is not efficiently allocated, as is the case with recreational fishing.

As the District Court recognized, the former merely means that *out of the alternatives considered*, which includes the reallocation to the commercial sector that Plaintiffs seek, the one chosen in the Rule results in the greatest net economic benefits to the nation. JA-0259, ECF 46 at 34; JA-5814, AR 17432. The Rule *does not* say that this allocation *maximizes* net economic benefits. There is no conflict here; both are true. It is unknown whether some allocation not considered in the Rule might generate greater economic benefits than did the Rule, but that is not what the Rule did or had to do. Rather, the task at hand was merely to determine which of the alternatives actually being considered generated the greatest benefit, and since this required only comparing those alternatives, it could be and was done. Plaintiffs are making a false contrast between the two statements. Nor is there any requirement for the Service to come to a conclusion regarding the economic benefits of every possible allocation, which is what a maximizing analysis does; comparative analysis of the alternatives being considered, as was done for the Rule, is sufficient.

Plaintiffs then posit a false assumption, that an economic analysis cannot be used to determine comparative benefits if it cannot be used to determine maximum benefits. It is true that maximizing economic benefits cannot be done because fishing privileges are not allocated within the recreational sector based on

willingness to pay, and since economic benefit is determined by willingness to pay, that the allocation to those who willing to pay the most cannot be determined. JA-4947, AR 11991. But as explained in the Rule, that is not what the comparative analysis did. Rather, it compared the benefits to each sector for the alternatives being considered – how much benefit each alternative would convey to each sector, and then compared those. This is a different analysis.

Secondarily, even if there somehow *were* an inconsistency, the District Court found that it would not be so egregious as to fall below the level of reasoned decision-making; and that the Service didn't "rely heavily " on it anyway. JA-0259, ECF 46 at 35. Plaintiffs argue incorrectly that the Service mentioned it repeatedly and so *must* have relied heavily on it. As the District Court pointed out, maximizing economic benefit was not the purpose for the Rule; optimizing yield was, and using the best scientific information available (FES) was paramount in that endeavor. Several mentions of net economic benefit do not change that. Nor is vacatur appropriate in any event, since there are reams of documentation of the comprehensive decisional process beyond the economic benefit analysis, the Service stated a rational basis for using that analysis (that it is comparative and not absolute), and its decision was based on using the best scientific information available.

# CONCLUSION

Plaintiffs' arguments are deeply flawed at their base. The Service has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *F.C.C. v. Fox Television Stations*, 556 U.S. 502, 513 (2009) (quotation omitted). Its "policy choices" are not up for debate – only the "explanation it has given." *Id*. at 530. The Service's explanation includes a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co*., 463 U.S. 29, 43 (1983) (quotation omitted). And the Service has considered all "important aspect[s] of the problem." *Id*. This is all that the Magnuson Act and the Administrative Procedures Act require. *Am. Clinical Lab. Ass'n v. Becerra*, 40 F.4th 616, 624 (D.C. Cir. 2022) (the courts "will uphold [an] agency's action if the agency 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made'"). The District Court correctly rejected Plaintiffs' arguments and its ruling should be affirmed.

Respectfully submitted,

**JEFF LANDRY**
**ATTORNEY GENERAL OF LOUISIANA**

/s/ Elizabeth B. Murrill
**ELIZABETH B. MURRILL (LA# 20685)**
**Solicitor General**
**LOUISIANA DEPARTMENT OF JUSTICE**
P. O. Box 94005
Baton Rouge, LA 70804
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 326-6766
Fax: (225) 326-6099
Email: murrille@ag.louisiana.gov

**LAWRENCE E. MARINO (LA #23206)**
**Special Assistant Attorney General**
**Oats & Marino**
**A Partnership of Professional Corporations**
Suite 400, Gordon Square
100 East Vermilion Street
Lafayette, LA 70501
Tel: (337) 233-1100
Fax: (337) 233-1178
Email: lmarino@oatsmarino.com

**COUNSEL FOR THE STATE OF**
**LOUISIANA**

# CERTIFICATE OF COMPLIANCE

1.    This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(i), D.C. Circuit Rule 32(e)(1), and this Court's order in this appeal dated March 15, 2023, because excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1), this brief contains 8,765 words.

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 MSO (Version 2304 Build 16.0.16327.20200) 64-bit in 14-point Times New Roman typeface.

/s/ Elizabeth B. Murrill
**ELIZABETH B. MURRILL**

## CERTIFICATE OF SERVICE

On June 14, 2023, I caused this Final Appellee Brief to be filed electronically with the Clerk of the United States Court of Appeals for the District of Columbia Circuit through ECF, which sent an e-mail notice of the electronic filing.  Pursuant to D.C. Circuit Rule 25, this constitutes service on all parties, as there are no parties who have not consented to electronic service.

/s/ Elizabeth B. Murrill
**ELIZABETH B. MURRILL**